**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Henry CENTRACCHIO and Anthony
Salemi, Defendants-Appellees.**

Nos. 84–2678, 84–2773.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1985.

Decided Oct. 16, 1985.

---

Gerald M. Werksman, David Walker, Chicago, Ill., for defendants-appellees.

Suzanne B. Conlon, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellant.

Before HARLINGTON WOOD, Jr. and ESCHBACH, Circuit Judges, and WILLIAM J. CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Each defendant raises a separate single issue. Defendant Henry J. Centracchio claims he did not receive a fair trial because of exchanges between his retained counsel and the district judge in the presence of the jury. Defendant Anthony J. Salemi claims he did not receive a fair trial because the trial judge declined to sever his

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, sitting by designation.

1. 18 U.S.C. § 371.

2. 18 U.S.C. §§ 2, 656.

trial from that of his codefendant Centracchio.

The defendants, together with a codefendant, Lambert F. Beck, were indicted for conspiracy to commit an offense against the United States.[1] Beck, an officer of the Broadway Bank, Chicago, Illinois, was also indicted for multiple acts of misapplication of bank funds insured by the Federal Deposit Insurance Corporation.[2] Salemi and Centracchio were indicted for aiding and abetting Beck. Beck pled guilty. A jury found Centracchio and Salemi guilty of conspiracy, Centracchio of fourteen counts of aiding and abetting Beck, and Salemi of twenty-two counts of aiding and abetting Beck. Centracchio was acquitted on one aiding and abetting count.[3]

### Facts

Beck and Salemi first met in 1976 when Beck worked as a cashier at Dempster Plaza Bank and Salemi was a depositor. Salemi and Centracchio had been close friends and sometimes business associates since 1963. Both Salemi and Centracchio were having financial problems during the period of the conspiracy, from July, 1981, to April, 1982.

During the conspiracy period Beck served as vice-president and installment loan officer of the Broadway Bank. Salemi and Centracchio induced Beck to fraudulently divert in excess of $275,000 in the bank's funds to them. Beck provided this beneficient banking service by making false entries in installment loan and other bank records, and by falsifying collateral records for car loans. Beck provided this service at the bank by himself. Centracchio, Salemi, and Beck communicated almost exclusively over the telephone to avoid arousing suspicions. Nonetheless,

---

3. Centracchio was sentenced to three years, fined $10,000, and ordered to pay restitution of $109,500. Salemi was sentenced to three years and ordered to pay restitution of $164,400.

the bank president eventually grew suspicious and began an investigation.

The fraudulent loans fall into three categories. In the first category were loans drawn by Centracchio and Salemi for themselves, either in their own names or through "straw" borrowers, and loans drawn by the codefendants' friends, employees, and associates who were unemployed, bankrupt, or otherwise burdened with liens, judgments, loans, and debts.

The second category of loans did not go to such worthy purposes, but were drawn in the names of Salemi's former employees, acquaintances, and relatives, none of whom had any connection with the bank or authorized the use of their names. Some of the proceeds from this group of loans, as might be expected, were traced to the bank accounts of Salemi and Centracchio. The evidence showed that Salemi had written one of the loan applications and likely forged the endorsement on the resulting loan check. One of Salemi's employees admitted forging one loan application and check as a favor to Salemi. Salemi kept a supply of loan forms in his office which took on some characteristics of a branch bank.

In the third category were loans issued in the names of fictitious persons. Centracchio second endorsed the cashier's checks issued by Beck for this group of loans. Some of the funds were traced to Centracchio's checking account at another bank. Centracchio forged a few applications himself.

Except for a case of champagne from Salemi, it is not clear what rewards Beck received for his innovative and liberal banking practices.

Centracchio called two character and reputation witnesses, and two friends who testified that they got loans from Beck without help from Centracchio. Centracchio's daughter testified for her father about a $9,500 loan she got from Beck; she was, however, unaware that the collateral for the loan was a nonexistent late model Cadillac.

Some of the government witnesses who received Beck loans were still friends of the defendants and portrayed them both as nice, helpful fellows who never instructed them to mislead Beck about their financial condition or pay Beck any kickbacks.

In his testimony Centracchio admitted filling out a few Beck loan applications for Salemi as Salemi did for him on occasion. Sometimes Centracchio also cashed Broadway loan checks payable to third parties for Salemi. Centracchio and Salemi were longtime and trusting friends. Centracchio testified, however, that in late 1981 he began to be concerned about Salemi's mental condition and business judgment. Centracchio testified that Beck asked Salemi and him to help collect some of the bank's bad loans. In their cross-examinations both defense counsel attempted to single out Beck as the lonely culprit who ran the program on his own for his own benefit, the success of which could be judged by the cash in his safety box. They also attempted to blame the bank for its negligent oversight. Finally both counsel tried in cross-examination to point the finger at a former employee of Salemi, but being deceased he could not defend himself.

We need not run out the evidence in all the loan transactions as they fit a pattern which can be sufficiently seen from what has already been recounted.

### Centracchio

Centracchio claims he did not receive a fair trial because of the "repeated clashes, open hostility and obvious rancor" between his retained counsel, Frank Oliver, and the district judge, Milton I. Shadur. Seventeen samples are cited from the over two-thousand-page transcript generated by the twelve-day trial. Centracchio suggests, but does not argue, that attorney Oliver was both technically and strategically correct in his approach to each witness. Of course the correctness of the rulings is not now the issue, rather the issue is whether the exchanges prejudiced the jury. The

government charges that attorney Oliver continually baited and argued with Judge Shadur.

**4.** (a) During Mr. Oliver's cross-examination of the former secretary to the bank loan officer this exchange took place:

Q. When borrowers walk into a bank, their attitude is pretty much where to sign. I will do whatever I have to do to give you whatever information you want.

Mr. Castillo: Objection, your Honor.

The Court: Yes, objection sustained.

Mr. Oliver, these questions that are largely speechmaking or argumentative, don't advance us very rapidly.

Mr. Oliver: I object to calling them speechmaking, your Honor.

The Court: I have just ruled, Mr. Oliver. Proceed.

Mr. Oliver: You may give the impression that I am making speeches, but I am not.

The Court: The impression is for the determination of the jury. I have ruled on the objection. I have sustained it.

Mr. Oliver: I am asking what the bank practice was.

The Court: No, that isn't what you asked, and the objection to the question that you asked is sustained.

(b) Centracchio contends that in the following exchange Judge Shadur demeaned Mr. Oliver in front of the jury:

Q. And it was thereafter that you found out that he was carrying documents around in a paper bag, right?

The Court: Now, Mr. Oliver, once again the reference to brown paper bag is something that I didn't hear from this witness, or indeed, haven't heard from anybody but you.

Did I understand you to refer to a shopping—

The Witness: A shopping bag.

The Court: Shopping bag, and that was a bank shopping bag you mentioned?

The Witness: Yes.

The Court: Can you tell us what it is like?

The Witness: IT is a plastic brown and white Broadway Bank shopping bag.

The Court: It is a plastic brown and white Broadway Bank shopping bag.

Now, Mr. Oliver, now that we have cleared that away, can we dispel with your references to the brown paper bag?

Mr. Oliver: The witnesses haven't disagreed, and your Honor seems to think that is significant.

The Court: No, that is not a question of being significant. It is a question of your modifying witnesses testimony. You will adhere, if you will, to what the witnesses have said.

Mr. Oliver: Your Honor, I may not always. If I don't agree with the witness I am not

going to adhere with what the witness said, if I know otherwise.

The Court: You are not going to change their characterizations, however. Now you may proceed with your question.

(c) Again during cross-examination by Mr. Oliver of a government witness:

Q. By the way, when Kashuba failed, and then when his insurer turned around and fled—

The Court: Now, just a moment. You want to pose a question without characterization, Mr. Oliver, you're free to do that, but not to embellish. If you want to limit yourself to what the testimony has been, you may do that. But I have yet to hear—

Mr. Oliver: No. I want to examine the witness.

The Court: That's what I'd like you to do that, not to testify.

Mr. Oliver: You know, there's a difference between direct and cross.

The Court: No, but in no case do lawyers testify, direct, cross, redirect or recross.

Mr. Oliver: No, they ask leading questions. To ask a leading question is to make a statement and get an affirmance or denial. (Tr. 792).

(d) Centracchio cites the following exchange which occurred during Mr. Oliver's cross-examination of an FBI agent as an example of Judge Shadur criticizing Mr. Oliver before the jury, in this instance for failing to make exhibits:

The Court: No, I'd like you to provide them to the Government first, so they may take a look.

Mr. Oliver: Well, there are going to be lots of exhibits, Judge.

The Court: You ought to have pre-marked them and provided them to the Government in advance. That's part of regular routine.

Mr. Oliver: That's one way of doing things.

The Court: It is indeed, and that's the way in this court as the Government did to you.

Mr. Oliver: But we don't know in advance what we are going to need, and we have to prepare on our feet.

The Court: Mr. Oliver, you will just provide them. The Government will take a brief look.

Mr. Oliver: I did so.

(e) Centracchio cites the following exchange as an example of a pattern of interruption of questions despite the lack of any objection by government counsel. This incident occurred on redirect by Mr. Oliver of Centracchio's daughter:

Q. When you were talking about sending money to your mother, your father was reluctant to lend you that money for that purpose, was there any discussion between you and

It is not necessary for our purposes to set forth in full all seventeen portions of the transcript Centracchio cites. We give a few examples in the footnotes.[4] On the

strength of these seventeen portions of the transcript Centracchio claims that hostility permeated the trial. Considering the size of the trial record those seventeen transcript portions, which only take up thirteen pages of the brief, are all but lost in the two-thousand pages of trial transcript. Centracchio colorfully argues that since he in no way "fueled the flames of antagonism and hostility which engulfed the courtroom," he should not be the one to suffer from the obvious results of the "conflagration," which caused his defense of good faith and reliance upon his codefendant to fall victim to the clash between judge and lawyer.

Although unorthodox, unfortunate, and not in the best professional tradition, the seventeen cited exchanges do not demonstrate that "the flames of antagonism and hostility" consumed Centracchio's fair trial rights. Centracchio likens this situation to that reviewed by this court in *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706. The circumstances in that well known case stand in stark contrast to the circumstances in the present case. In *Dellinger* the trial judge made

> remarks in the presence of the jury, deprecatory of defense counsel and their case. These comments were often touched with sarcasm, implying rather than saying outright that defense counsel was inept, bumptious, or untrustworthy, or that his case lacked merit. Sometimes the comment was not associated with any ruling in ordinary course; sometimes gratuitously added to an otherwise proper ruling; nearly always un-

necessary. Taken individually any one was not very significant and might be disregarded as a harmless attempt at humor. But cumulatively, they must have telegraphed to the jury the judge's contempt for the defense.

*Dellinger*, 472 F.2d at 387 (footnote omitted).

Judge Shadur did not come close to this sort of extreme, nonjudicial sort of behavior. In fact, the transcript shows a trial judge presiding with patience, fairness, and good humor over a difficult trial with difficult counsel. In one instance Mr. Oliver, in objecting to the manner the government was conducting its direct examination called it "an absurd examination." Judge Shadur responded: "Well, Mr. Oliver, you will conduct your absurd examination, as the government is doing theirs." Tr. 314. In another instance the following colloquy occurred when Mr. Oliver obstinately continued a line of questioning after Judge Shadur had sustained an objection to it:

THE COURT: I don't know, Mr. Oliver, I guess you haven't been paying attention.

MR. OLIVER: Are you talking about the times when you have stopped and admonished me for this, that, and the other?

THE COURT: Yes, which is the least relished part of the activities.

MR. OLIVER: I don't look forward to those things.

THE COURT: I thought you did because—

MR. OLIVER: No, I just do the best I can, and you know, courts aren't always right.

---

your father about why it might be better if your mother could see that that was a bank loan?

A. Well, yes, because she didn't—she would see that it's in my name and she wouldn't want to destroy my credit whatsoever.

Q. On the other hand, if that money came from your father, she might be a little more careless about—

THE COURT: Mr. Oliver, are you going to be asking a question or making a statement?

. . . .

BY MR. OLIVER:

Q. Well, you learned from one or two of the folks that you talked to that Mr. Centracchio was known to go to the racetracks; isn't that right?

A. Yes.

Q. And did you learn from any of those people that Mr. Centracchio was something in the nature of a genius at handicapping horses at racetracks?

MS. CONLON: Objection, your Honor.

THE COURT: Objection is sustained, as, Mr. Oliver, you may have anticipated.

MR. OLIVER: I never anticipate.

THE COURT: I know that.

THE COURT: That is true. Although Judge Perry told me that he was sometimes reversed but never wrong.

Tr. 407.

Beyond these exchanges there were numerous bench conferences outside the presence of the jury in which Judge Shadur endeavored to persuade Mr. Oliver to follow the ordinary rules of trial procedure so as to avoid any unnecessary problems before the jury. Mr. Oliver had to be dealt with by Judge Shadur.

### Salemi

On numerous occasions before, during, and after trial Salemi moved for severance of his trial from Centracchio's. Judge Shadur denied all severance motions. Salemi contends that from the beginning the codefendants' defense theories were irreconcilable and antagonistic. Salemi paints Centracchio's defense as an attempt to shift the blame to him, Salemi, for illegal conduct in concert with Beck. Salemi also points to some comments about Salemi's mental health which Centracchio's attorney, Mr. Oliver, made. Salemi objects to Centracchio's testimony that Salemi participated in a meeting with Beck and Centracchio and paid Beck for some loan back payments and to Centracchio's testimony that Beck attempted to have Salemi killed and that Salemi was no longer his friend. Salemi objected to some of Mr. Oliver's cross-examination of government witnesses, and generally to Mr. Oliver's other conduct and comments, Mr. Oliver at one time revealing to the jury that Beck had pleaded guilty. Salemi argues that being tried with Centracchio prejudiced him and resulted in his conviction merely because of his association with Beck and Centracchio.

Salemi did not testify and called only one witness, the FBI case agent, in an effort to impeach another witness over a collateral financial figure. His attorney also actively cross-examined government witnesses.

The government denies that the record supports Salemi's claims of prejudice from the joint trial. Both defendants were charged in the same indictment as coconspiring to misapply the funds of the Broadway Bank, and participating with Beck in an interrelated series of loans and misappropriating the loan proceeds for themselves and others. The government argues that Rule 8(b) Fed.R.Crim.P. permits joinder even though the two defendants were not both charged in each count. To have severed, the government argues, would have resulted in substantial duplication in the testimony of the government's twenty-four witnesses and the numerous bank records, checks, and other documentary evidence. The government characterizes the objections as based on nothing more than characterizations and posturing during trial and the defenses as neither antagonistic nor irreconcilable, but in fact similar.

■ Although denying all severance motions, Judge Shadur was concerned about the severance issue from the beginning and weighed and reconsidered the issue on several occasions as the trial developed. We share Judge Shadur's severance concerns, but, as did he, we find severance was not required. Judge Shadur did not abuse his discretion in denying severance. *See United ed States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.), *cert. denied sub nom. Merritt v. United States*, ── U.S. ──, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985). Basically the defenses, weak as they were, paralleled each other, apart from some occasional friction or flare-up which, when considered in the context of the entire trial, were inconsequential. Both defendants endeavored to show that their dealings with the bank were in good faith; that they were unaware of any fraud and did not knowingly participate in any fraud; that the government had failed to meet its burden of proof as to their guilt; and that they were both reputable businessmen who were willing to do favors and help people with problems which included cashing checks and loaning money. Both defendants endeavored to show that Beck ran the loan program on his own for his own benefit, not theirs, and that Broadway Bank negligently permitted Beck to operate. Both defendants attempted to discredit various government witnesses. The government denies that either codefendant at-

tempted to inculpate the other on any substantive issue.

 The rule in this circuit, as stated in *United States v. Hasting,* 739 F.2d 1269, 1274 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1199, 84 L.Ed.2d 343 and *sub nom. Anderson v. United States,* —— U.S. ——, 105 S.Ct. 1199–1200, 84 L.Ed.2d 343 (1985), is that mutually antagonistic defenses do not necessarily mandate severance. It cannot be realistically required that before codefendants are tried together they must be in total agreement as to their defenses. The requirement is only that the defenses if actually antagonistic, not be so antagonistic that the acceptance of one codefendant's defense would actually preclude the acquittal of the other defendant. *Id.* In the present case the codefendants did more good for, than harm to, each other, and any slight friction between their defenses that there may have been had no significant impact on the defense of either.

Evidence that the defense of Centracchio was not so antagonistic as to preclude the jury from accepting Salemi's defense is found in a comparison of the summaries given by Judge Shadur to the jury near the close of the instructions as to each defendant's perspective of the case. These summaries were prepared by the codefendants' respective counsel in keeping with their own final arguments.

Henry Centracchio contends that:

1. The evidence offered by the government does not establish that he engaged in acts that he knew were dishonest.

2. Evidence that he has offered shows that before 1981 he had been engaged in a long series of business transactions with Anthony Salemi and that his experience with Mr. Anthony Salemi gave him no reason to suppose that Mr. Salemi would engage in dishonest business practices.

3. When Mr. Salemi engaged Mr. Centracchio in transactions with the Broadway Bank, he, that is Mr. Centracchio, complied with Mr. Salemi's request in the belief that he was assisting an old business associate in establishing a banking relationship that Mr. Salemi needed.

4. The only profit that Mr. Centracchio expected to obtain from the transactions was the pleasure of seeing an old business partner reestablish himself in the world of banking.

. . . .

... Mr. Salemi contends that:

1. The evidence offered by the government does not establish that he engaged in actions that he knew were dishonest.

2. The evidence does not show that Anthony Salemi and Lambert Beck had any agreements whatsoever of having persons come into the Broadway Bank to obtain false and fraudulent loans. First, there was no money given by any person to either Lambert Beck or Anthony Salemi to receive those loans, and Anthony Salemi had no conversations with persons to go into the Broadway Bank and to lie to Lambert Beck or any other bank official about loan information.

3. Anthony Salemi always had a reputation as a person who would help other people, and part of that help would be in informing persons as to banks they could apply for a loan.

The two summaries' first paragraphs are identical. Centracchio's second summary paragraph says he had known Salemi for many years and had no reason to suspect him. That expression of longtime friendship and trust in Salemi is not antagonistic to Salemi. Salemi's second paragraph denies any fraudulent association with Beck. In paragraphs three and four Centracchio says he acted to assist an old business associate, Salemi, to establish a banking relationship, not for personal gain. In Salemi's second and third paragraphs Salemi concedes his involvement with other people's loans, but explains it as merely being a helpful person.

Although there was some friction between the two codefendants during trial, the friction was not great. Salemi complains about Centracchio's testimony that he (Centracchio) attended a meeting with Beck and others where Salemi was mentioned. Salemi does not explain, however, why if this testimony was so damaging, his

trial counsel made no objection to this hearsay testimony. Centracchio also testified that Beck sought to have Salemi killed. Salemi's trial counsel did not object to this testimony either, but on cross-examination attempted to turn this testimony to Salemi's advantage by showing that Beck's plan to put a contract out on Salemi was part of a Beck scheme to take out a life insurance policy on Salemi, have him killed, and then fraudulently collect the insurance proceeds. Centracchio also expressed his present dislike for Salemi, but that does not mandate severance. Hostility between defendants or desire of one to exculpate himself by inculpating another is not enough by itself to require reversal for failure to sever. *United States v. Hendrix*, 752 F.2d at 1232. Actual and substantial prejudice must be shown to justify severance under Rule 14 of the Federal Rules of Criminal Procedure. *United States v. Harris*, 761 F.2d 394, 400–01 (7th Cir.1985).

The antics and comments of Centracchio's trial counsel, some of which we have already partially examined, were not sufficiently detrimental to Salemi's defense to warrant severance. One-half of what Salemi complains about did not happen in the presence of the jury. In regard to matters occurring before the jury Judge Shadur by his rulings and instructions guided the proceedings through to a fair trial for both defendants. We find no fault with Judge Shadur's conduct of this trial under these circumstances. Judge Shadur, a patient, disciplined, and seasoned trial judge, never lost sight of the need to provide the defendants with fair trials. In our judgment he succeeded.

Salemi also argues that the evidence presented was insufficient to support his conviction beyond a reasonable doubt and that his conviction was improperly based on his innocent association with Beck and codefendant Centracchio. We review the evidence at this appellate stage in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942).

The evidence presented showed that during the period of the conspiracy Salemi was under severe financial pressure. After a confrontation with the Broadway Bank president concerning his $172,000 delinquent loan, Salemi started making clandestine telephone calls to Beck on a daily basis and the fraudulent loans started just after Salemi's confrontation with the bank president. An expert testified that Salemi forged a loan application made out in the name of his business associate. Salemi's handwriting was also identified on a loan application in a fictitious name and his fingerprint was found on another "fictitious borrower" application. There is more evidence in the record supporting Salemi's guilt but we will not beat a dead horse.

Although Salemi sought to convince the jury that he was innocently associated with the guilty parties, Beck and Centracchio, the jury did not believe this defense; rather, they believed that the government proved its case against Salemi beyond a reasonable doubt. The record lends more than ample support to this jury finding.

Based on the overwhelming and convincing evidence neither defendant deserved any verdict other than guilty.

AFFIRMED.