RIPPLE, Circuit Judge.
 

 Following a four-week trial, a jury convicted defendants Mohammad S. Mohammad and Asad Saleh of conspiracy and multiple counts of bankruptcy fraud, mail fraud, wire fraud and Currency Transaction Reporting Act violations pursuant to 18 U.S.C. §§ 371, 152, 1341, 1343, and 31 U.S.C. § 5322. On October 25,1993, the district court sentenced Mr. Mohammad to 92 months of imprisonment; it also imposed a fine of $9,600 and restitution of $3.2 million. The court sentenced Mr. Saleh to 40 months of imprisonment and ordered payment of $3.2 million in restitution. On appeal both defendants submit that the district court’s bias prevented them from receiving a fair trial. Mr. Mohammad also challenges the trial court’s denial of his severance motion and the enhancement of his sentence under the United States Sentencing Guidelines (“U.S.S.G.”). For the reasons that follow, we affirm the defendants’ convictions. Because the district court improperly delegated the manner of the payment of restitution to the probation officer, however, we must vacate the order of restitution of each defendant and remand the case to the district court for the entry of an order that conforms to our precedent.
 

 I
 

 BACKGROUND
 

 Following the investigation of the activities of Discount Merchandise, Inc. (“DMI”) and its principals by the Federal Bureau of Investigation, the United States brought a twenty-six count superseding criminal indictment against Mr. Mohammad, Mr. Saleh and others (primarily members of their family).
 
 *1430
 
 The charges alleged that the defendants were involved in a “bust-out” scheme to defraud DMI’s trade creditors.
 
 [1]
 
 According to the indictment, Mr. Mohammad and other family members conspired to defraud DMI creditors. The scheme involved (1) ordering on credit large quantities of goods and services worth more than $3.1 million, for which the defendants did not intend to pay; (2) selling those goods for less than their cost; (3) diverting approximately $1.7 million of the proceeds from the sale of those goods to bank accounts held by various family members, and eventually out of the United States to Jordan; and (4) concealing the diversion. In the remaining twenty-five counts, the indictment alleged the fraudulent activities by which the defendants carried out their scheme. After considering the testimony and evidence presented in the four-week trial of this case, the jury found Mr. Mohammad and Mr. Saleh guilty of conspiracy to commit bankruptcy, mail, and wire fraud as well as currency reporting violations.
 

 The evidence of record establishes that, in December 1988, Mr. Mohammad and various relatives established DMI, a company that sold non-perishable consumer goods on a wholesale basis.
 
 [2]
 
 Mr. Mohammad’s brother, Anwar Saleh, was president and sole officer of the business; his nephew, defendant Asad Saleh, ran the warehouse when Mr. Mohammad was unavailable. For several years, DMI operated as a legitimate company in Chicago. It rented an office in April 1989, opened bank accounts, and began ordering goods from manufacturers and reselling them at wholesale prices. It also paid the suppliers, thereby establishing good credit references. When DMI began buying larger quantities of goods, it leased a warehouse in June 1990 to store them. Mr. Mohammad directed the management of the warehouse, and his nephew Asad Saleh was in charge of it when Mohammad was away. During the period from January through April 1991, DMI filled the warehouse by ordering approximately $3.2 million in goods and services on credit from 132 suppliers. When the warehouse was full, Mr. Mohammad leased storage lockers and controlled access to them. By the end of May 1991, however, the warehouse and office were empty and abandoned.
 

 The “bust-out phase” took place between February and April 1991. The defendants sold the goods they had bought on credit as quickly as possible and often for less than they had paid. To conceal the diversion of the proceeds, they asked their customers to pay in cash or in checks payable either to
 
 *1431
 
 themselves or to cash. They rented trucks to deliver the sold goods to DMI customers, but never paid the lease amounts. Between February and August 1991, the defendants diverted the approximately $1.7 million in proceeds to their own accounts in eight financial institutions. They also structured the cash deposits in amounts under $10,000 to evade reporting requirements. According to the government’s evidence, Mr. Mohammad actually diverted and structured over $601,-000, often with deposits made by his wife Mariam Saleh. Asad Saleh diverted and structured over $487,000. More than $538,-000 went into accounts shared by the two defendants. The accounts were opened just before the bust-out began and closed when the bust-out scheme was completed. From April through August 1991 Mr. Mohammad, Asad Saleh and others then converted the fraud proceeds: They obtained cashier’s checks totalling about $1,259,922 and deposited them in Jordanian bank accounts. Some of the proceeds were “laundered” in Jordan and then transported back to the United States, where they were deposited into other bank accounts maintained by Mohammad.
 

 During this period the defendants also worked to persuade creditors of DMI not to take legal action against DMI. Anwar Saleh mailed letters to the creditors, promising to pay them soon but explaining that DMI had a cash flow problem because it had not collected its receivables. On July 19, 1991, nevertheless, DMI’s creditors commenced an involuntary case under Chapter 7 against DMI, and on August 14, 1991 an order for relief was entered. Yet, despite the automatic stay requirement, the defendants continued to divert and to conceal proceeds fraudulently derived from the business. On August 2, 1991, a trustee was placed in control of DMI; he seized about $300,000 in fraudulent proceeds, but the remaining funds and assets were gone.
 

 II
 

 ISSUES
 

 A.
 
 Severance
 

 Mr. Mohammad’s request that the trial court sever his trial from that of his wife Mariam Saleh was denied.
 
 [3]
 
 He submits to this court that, because their defenses were mutually antagonistic and her testimony at their joint trial was unduly prejudicial to him, the district court abused its discretion in refusing to grant severance.
 

 1.
 

 Federal Rule of Criminal Procedure 14 gives trial courts the discretionary authority to grant a severance of defendants “[i]f it appears that a defendant ... is prejudiced by a joinder ... for trial together.” We review a district court’s denial of a defendant’s motion to sever for an abuse of that court’s sound discretion.
 
 Zafiro v. United States,
 
 — U.S. -, -, 113 S.Ct. 933, 939,122 L.Ed.2d 317 (1993);
 
 United States v. Edwards,
 
 36 F.3d 639, 647 (7th Cir.1994);
 
 United States v. Donovan,
 
 24 F.3d 908, 915 (7th Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994). In order to establish that severance ought to have been granted, Mr. Mohammad must establish that the joint trial resulted in actual prejudice. “Actual prejudice means that the defendant could not have a fair trial without severance, ‘not merely that a separate trial would offer him a better chance of acquittal.’ ”
 
 Edwards,
 
 36 F.3d at 647 (quoting
 
 United States v. Moya-Gomez,
 
 860 F.2d 706, 754 (7th Cir.1988) (quoting in turn
 
 United States v. Papia,
 
 560 F.2d 827, 836 (7th Cir.1977)), ce
 
 rt. denied,
 
 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989)).
 

 
 *1432
 
 When defendants are properly joined as codefendants under Federal Rule of Criminal Procedure 8(b), “a joint trial is ‘presumptively appropriate,’ ”
 
 United States v. Chapman,
 
 954 F.2d 1352, 1359 (7th Cir.1992), because it more efficiently considers the roles of those indicted together and accused of a joint scheme.
 
 [4]
 

 See Zafiro,
 
 — U.S. at -, 113 S.Ct. at 937;
 
 United States v. Ramirez, 45
 
 F.3d 1096, 1100 (7th Cir.1995);
 
 Edwards,
 
 36 F.3d at 647. A district court should grant a severance “only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.”
 
 Zafiro,
 
 — U.S. at-, 113 S.Ct. at 938. Mr. Mohammad’s claim is that there is a mutual antagonism between his own defense and the defense of his wife. However, “[m]u-tually antagonistic defenses are not prejudicial
 
 per se.” Zafiro,
 
 — U.S. at-, 113 S.Ct. at 938. If there is a risk of prejudice, measures such as proper limiting instructions often suffice to cure the risk “that one defendant will be convicted on account of another defendant’s actions.”
 
 Ramirez,
 
 45 F.3d at 1100 (citing
 
 Zafiro,
 
 — U.S. at -, 113 S.Ct. at 939).
 
 [5]
 

 2.
 

 Mr. Mohammad submits that his wife’s defense unfairly prejudiced his own defense in three ways. First, the general premise of her defense, he asserts, is that her husband was “a bad person” and was “guilty,” whereas she, his dutiful wife, was not guilty. Mr. Mohammad points to her testimony that she would not discuss business with her husband; that she would dutifully follow his orders; and that he required her to make large cash deposits for him, about which she knew nothing.
 

 Our review of Mariam Saleh’s testimony indicates that she portrayed herself as a housewife whose responsibility was to raise the children, and that her husband was in charge. She stated that she knew nothing about his businesses except that he sold gold and that he was a salesman for DMI. She testified that she deposited money and obtained cashier’s checks for her husband at his request. This testimony is consistent with her husband’s position that he was simply a salesman for DMI but made his living selling gold, and that he sent his wife to perform the banking transactions. There is, therefore, nothing “mutually antagonistic” in the nature of the defenses of Mariam Saleh and her husband Mohammad. As a consequence, the jury clearly could have determined that Mar-iam Saleh was innocent of the charges against her without precluding a finding that Mr. Mohammad was innocent. It could reasonably have found from her testimony, for example, that the source of the money she took to the bank for him was his gold business. We conclude that the defenses of Mr. Mohammad and his wife were not conflicting, and indeed that there was hardly any tension between their statements.
 
 Cf. United States v. Walker, 25
 
 F.3d 540, 545 (7th Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994) (noting tension between eoconspirators’ statements, but finding nothing antagonistic). Mr. Mohammad’s claim that he was prejudiced because of irreconcilable defenses is meritless.
 

 Mr. Mohammad also asserts that he was prejudiced by Mariam Saleh’s admission that her husband previously had been convicted of a crime concerning “bad cheeks.” He claims that the trial court allowed questioning about his conviction over his objection, and that he therefore was forced to take the stand. Our review of the record on this issue indicates that this claim is equally mer-itless. Earlier in the trial Mr. Mohammed’s
 
 *1433
 
 counsel had announced to the court that his client would testify. At a sidebar held before Mariam Saleh testified, Mr. Mohammad’s attorney reiterated Mr. Mohammad’s intention to testify and stated that Mariam Saleh’s testimony about his prior conviction would not be a problem because Mr. Mohammad would “make a modest confessional of his former conviction himself.” Tr. at 1604. Mr. Mohammad’s lawyer did object when Mrs. Saleh began her testimony concerning her husband’s “problem in the court,” but then withdrew his objection when the court reminded him at sidebar that he had agreed to this line of questioning. Clearly, therefore, Mr. Mohammad had consented to his wife’s testimony about his earlier sentence, and was not forced to testify because she raised the prior conviction. We conclude that Mr. Mohammad was in no way prejudiced by Mariam Saleh’s statement about his prior conviction.
 

 Mr. Mohammad’s third claim of prejudice is that the testimony of his wife’s expert witness concerning the passive role of women in Islamic culture created the impression that Mr. Mohammad was an authoritarian person who used his wife as a pawn in his schemes. We consider this argument to be a grasping at straws. We note first that Mr. Mohammad neither objected to this testimony nor cross-examined the expert. Furthermore, the expert’s opinion is hardly a basis for severance. There is nothing in the Islamic expert’s testimony that caused Mariam Saleh’s defense to be mutually antagonistic to Mr. Mohammad’s defense or that “prevented] the jury from making a reliable judgment about guilt or innocence.”
 
 Zafiro,
 
 — U.S. at-, 113 S.Ct. at 938.
 

 We conclude that Mr. Mohammad was not prejudiced by the joint trial with his codefendant wife. Even if there was some risk of prejudice, however, the jury was given the proper limiting instructions. It was instructed that the government must prove “the guilt of each defendant beyond a reasonable doubt” and that it “must give separate consideration to each defendant, analyzing the evidence in the case with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant.” Instrs. 10, 14. Because the jury is presumed to follow such instructions, we are confident that they “sufficed to cure any possibility of prejudice.”
 
 Zafiro,
 
 — U.S. at-, 113 S.Ct. at 939;
 
 Ramirez,
 
 45 F.3d at 1100-01;
 
 see also Edwards,
 
 36 F.3d at 648 (citing
 
 United States v. Crockett,
 
 979 F.2d 1204, 1217-18 (7th Cir.1992),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993)). We conclude that the district court did not abuse its discretion in denying Mr. Mohammad’s motion for severance of his trial.
 

 B.
 
 Bias of the Trial Court
 

 The appellants point to three instances of bias by the district court that, in their view, denied them a fair trial. We have examined the record in detail and shall discuss each instance briefly. In undertaking this examination, we must remember that the court’s statements must be viewed in the context of the entire record.
 
 See United States v. Haddon,
 
 927 F.2d 942, 949 (7th Cir.1991).
 

 1.
 

 The appellants first invite our attention to the district court’s comments during the cross-examination of Suliman Abu Aw-wad, a former employee of DMI. They submit that they suffered prejudice because the court criticized Mr. Mohammad’s counsel in front of the jury and continued the criticism at sidebar. The appellants claim that it was error for the district court to deny the motion for mistrial. In their view, the court’s complimentary comments about defense counsel during the sidebar, out of the presence of the jury, did not cure the damage done by its criticism of the attorney in front of the jury.
 

 Our review of the course of proceedings in the district court reveals that, although the exchanges between court and counsel certainly were not models deserving of inclusion in a trial advocacy textbook, they could not have had the impact on the jury that the appellants suggest. The district court was concerned that defense counsel’s technique would cause undue confusion for the witness
 
 *1434
 
 as well as the jury.
 
 [6]
 
 Defense counsel made, at best, a half-hearted effort to conform to the judge’s rulings and, in the judge’s view, overstepped the bounds by not conforming to the directives of the sidebars and by arguing a point of law before the jury rather than at sidebar. Defense counsel’s other remarks, such as noting to the jury that the witness had testified before the grand jury on April Fool’s Day, no doubt contributed to the atmosphere in which the court handled the matter. Although the district court’s reaction before the jury could have been a bit more measured, we cannot say that its handling of the situation prejudiced the defendants in the eyes of the jury.
 

 Exchanges between defense counsel and the court do not by themselves necessarily demonstrate bias.
 
 United States v. Centracchio,
 
 774 F.2d 856, 860 (7th Cir.1985). This situation is quite different from the one that confronted the court in
 
 United States v. Dellinger,
 
 472 F.2d 340, 386-87 (7th Cir.1972),
 
 cert. denied,
 
 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). The court’s comments cannot be characterized as personal attacks on the defense attorney. When the record is evaluated in its entirety, we cannot say that the jury in this case witnessed the same harshness on the part of the district court toward the defense counsel as was evident in
 
 Dellinger.
 
 As a general proposition, a judge should be impartial and should reserve criticism for times when the jury is not present.
 
 United States v. Kwiat,
 
 817 F.2d 440, 447 (7th Cir.),
 
 cert. denied,
 
 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987). However, the district court also has the responsibility to exercise reasonable control over the interrogation of witnesses. Fed.R.Evid. 611(a). On that judicial officer’s shoulders rests the responsibility for the orderly progression of trial.
 
 United States v. Blakey,
 
 607 F.2d 779, 788 (7th Cir.1979). Here the district court was obviously attempting to fulfill that responsibility.
 
 [7]
 
 We cannot say that its efforts exceeded the bounds of discretion.
 

 2.
 

 Mr. Mohammad also argues that the court erroneously allowed testimony about his prior conviction by his wife Mariam Sa-leh. At that point Mr. Mohammad had not yet testified. Mr. Mohammad asserts that this ruling reflected the bias of the court because it allowed the prior conviction to be used as substantive evidence rather than for purposes of impeachment.
 
 [8]
 

 As we noted above in Part II.A.2, when defense counsel objected to the question “Mariam, do you remember ... [that] your husband had a problem in the court?”, the court called a sidebar and reminded counsel that he had agreed to this line of questioning when it was discussed previously by the parties. Defense counsel then withdrew the objection. The court told the jury that the objection was withdrawn and the examination continued. There was no undue prejudice to Mr. Mohammad.
 

 3.
 

 Asad Saleh claims that the court demonstrated its bias against the defense during his cross-examination of another government witness, Mr. Bevis, a Budget truck rental agent. While Mr. Saleh’s attorney was cross-examining the witness on the basis of the witness’ own records, the court called a sidebar and then ordered a fifteen-minute break so that the witness could “straighten out his testimony.” Appellants’ Br. at 13,
 
 *1435
 
 citing tr. at 807-13.
 
 [9]
 
 According to defense counsel, after the recess, the witness came back with “new” testimony. In Mr. Saleh’s view, this crucial ruling against the defense, as well as the court’s demeanor while ruling, demonstrated the court’s bias against the defense. He insists that, had cross-examination been allowed to continue, the witness would have been impeached in front of the jury.
 

 We cannot accept the defense’s characterization of the record. During direct examination, Mr. Bevis had testified that eleven rental agreements were executed in May and June of 1991. As the time for recess approached, the court inquired how much longer direct examination would last. When direct examination was concluded, the court asked: “Before I break are there going to be cross-examination questions?” Mr. Mohammad’s lawyer had none; Mr. Asad’s lawyer stated he had “just a couple.” Tr. at 806. The court replied, “If you mean that, let’s do it now so we can let the witness go before we break.” Tr. at 806-07.
 

 Mr. Asad’s attorney asked for a further explanation of the eleven rentals and suggested that, although there were eleven contracts, only four or five vehicles were rented at a time. The witness would not change his testimony; therefore the attorney said, ‘Well, let’s forget about this.” He then moved to another issue. At that point the court stopped the cross-examination and called a sidebar. The court stated, “I wanted to let this guy go before we broke, and I don’t like to interfere, but what he is saying has no basis at all in the facts that you put in evidence_” Tr. at 809. The judge explained that the evidence indicated that defense counsel’s approach was right and that the witness’ testimony was misleading. He further explained that he did not want the jury spending days looking at the contracts. On that basis he stated in open court, with apologies, that the witness needed to stay, and that there would be a ten-minute recess. Once the jury left, the judge instructed the witness to look again at the contracts. He left it to the attorneys to decide how to clarify the issue. After the recess, the court called for Mr. Saleh’s counsel to continue the cross-examination. The witness readily corrected his testimony. “Although we do not encourage overactive participation by a trial judge,”
 
 United States v. Koliboski,
 
 732 F.2d 1328, 1330 (7th Cir.1984), it is very clear that the district court acted well within the bounds of its discretion. Indeed, this intervention substantially undercuts the appellants’ claim that the district court was biased against the defense. Here, it was the defense counsel’s position that was vindicated.
 

 C.
 
 Sentencing Errors
 

 Mr. Mohammad submits that the district court incorrectly computed his sentence by increasing it four points under § 3Bl.l(a) for his leadership role in the offense and two points under § 2Fl.l(b)(3)(B) for his violation of a judicial order. He claims error in the court’s one-point increase in his criminal history level, as well. We review the sentencing court’s factual determinations under the clearly erroneous standard,
 
 United States v. Billops,
 
 43 F.3d 281, 287 (7th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995), and we shall not disturb those findings unless our review of the evidence as a whole leaves us with the “‘definite and firm conviction that a mistake has been committed.’ ”
 
 Mustread,
 
 42 F.3d 1097, 1103 (7th Cir.1994) (quoting
 
 United States v. Herrera,
 
 878 F.2d 997, 1000 (7th Cir.1989)). However, we review de novo the sentencing court’s legal conclusions, such as its interpretation of the scope of a guideline.
 
 United States v. Tai,
 
 41 F.3d 1170, 1174 (7th Cir.1994).
 

 (1) U.S.S.G. § 3Bl.l(a)
 

 Guideline § 3Bl.l(a)
 
 [10]
 
 allows a court to add four levels to a defendant’s sentence if
 
 *1436
 
 he was an organizer or leader of a criminal activity which involved five or more participants or was “otherwise extensive.” At the sentencing hearing conducted at July 23, 1993, the district court found that there were three participants, defendants Mohammad and Saleh and Mr. Mohammad’s fugitive brother Anwar Saleh. It noted that, of the eight persons indicted, two were found guilty, two were found not guilty, one was dismissed, and three are fugitives. However, after reviewing
 
 United States v. Miller,
 
 962 F.2d 739, 745 (7th Cir.1992), and
 
 United States v. DeCicco,
 
 899 F.2d 1531 (7th Cir.1990), the court applied the § 3Bl.l(a) enhancement because the criminal activity was “otherwise extensive.” As the court explained,
 

 [A]ll that is required to find that the scheme is otherwise extensive is that the defendant directed at least one criminal participant. And that is Anwar Saleh-And it was otherwise extensive because it included any number of people who were used to carry out the purposes of the conspiracy, including some people who were found not guilty.
 

 Sent. Tr. at 64-65. The court considered that the secretary, the employees hired to move the goods, and the DMI employee Abu Awad were other “outsiders” who were involved, but that “Mr. Mohammad was the major leaguer.”
 
 Id.
 
 at 65. On that basis it imposed a four-point increase in Mr. Mohammad’s offense level.
 

 On appeal Mr. Mohammad submits that the sentencing court was required to identify the five people over whom he had control. Relying on
 
 United States v. Schweihs,
 
 971 F.2d 1302, 1318 (7th Cir.1992), he asserts that, because the court failed to meet that requirement, this case must be remanded for resentencing. The government responds that § 3B1.1 increases the offense level for an organizer or leader either if he organized five participants or if the criminal activity was “otherwise extensive.” Under this latter prong of the guideline, therefore, the government submits, five criminally culpable participants need not be identified. The government invites our attention to Application Note 2 of the guideline
 
 [11]
 
 and to
 
 United States v. Cojab,
 
 978 F.2d 341 (7th Cir.1992), which explains that “the ‘otherwise extensive’ language of section 3B1.1 is generally intended to go beyond criminal participants and include those who may not be criminally culpable or charged with any crime.”
 
 Id.
 
 at 344.
 

 Section 3B1.1 contains several subsections that reflect “a range of increases in offense level for defendants found to have played an aggravated role in a criminal activity.”
 
 Mustread,
 
 42 F.3d at 1103. Subsection (a) provides a four-level enhancement to a defendant who organized, led, managed or supervised a large-scale criminal activity that “involved five or more participants or was otherwise extensive.” The first application note to the § 3B1.1 Commentary defines a “participant” as a person criminally responsible for an offense, whether or not he was convicted of the crime. U.S.S.G. § 3B1.1, comment. (n.l);
 
 Mustread,
 
 42 F.3d at 1103 (citing
 
 United States v. Cantero,
 
 995 F.2d 1407, 1414 (7th Cir.1993)). The second application note states that all persons involved during the course of the offense may be considered in the assessment.
 
 Tai,
 
 41 F.3d at 1173.
 

 In
 
 Tai,
 
 a case involving an extortion scheme of three criminally responsible participants and two others who facilitated the activity, the sentencing court enhanced Tai’s offense level by four points under § 3Bl.l(a). Reviewing the § 3Bl.l(a) enhancement, our court noted first that the five individuals involved were not all participants, and thus could not satisfy the first prong of § 3Bl.l(a). This court then examined the minimum requirements necessary to support a finding that a given activity was “otherwise
 
 *1437
 
 extensive.”
 
 [12]
 
 Interpreting that term “in a manner that does no violence to the remainder of Section 3B1.1,” the court stated that the phrase “demands a showing that an activity is the
 
 junctional equivalent
 
 of an activity involving five or more participants.”
 
 Id.
 
 at 1174. Our court remanded
 
 Tai
 
 to the district court because “three participants and two outsiders simply cannot be equated to an activity involving
 
 five or more participants”;
 
 an “otherwise extensive” activity must “point to some combination of participants and outsiders equaling a number greater than five.”
 
 Id.
 
 at 1174-75. However, the court reaffirmed the district court’s broad discretion “to examine factors in addition to a headcount to justify a finding that a given criminal activity is extensive.”
 
 Id.
 

 In the case before us, there are three participants and a large number of outsiders who were involved during the course of the offense and whose services made the bust-out scheme work. The sentencing record reflects that the court reviewed the roles of many individuals involved in the scheme in varying degrees of culpability, and credited the “unknowing services of many outsiders” in deciding that Mr. Mohammad was indeed the leader or organizer of a criminal activity that was “otherwise extensive.” The court’s conclusion that Mr. Mohammad had greater responsibility for the fraudulent scheme than others and that he organized an “otherwise extensive” criminal activity is not clearly erroneous.
 

 (2) U.S.S.G. § 2Fl.l(b)(3)(B)
 

 Mr. Mohammad was convicted on four counts of concealing bankruptcy assets under 18 U.S.C. § 152.
 
 [13]
 
 At sentencing, Mr. Mohammad’s offense level was increased by two levels under Part 2F of the Guidelines, “Offenses Involving Fraud or Deceit,” and specifically under U.S.S.G. § 2Fl.l(b)(3)(B):
 

 If the offense level involved ... (B) violation of any judicial or administrative order, injunction, decree or process, increase by 2 levels. If the resulting level is less than level 10, increase to level 10.
 

 Mr. Mohammad asserts that his conviction under the statute was based on the finding that he violated the bankruptcy court’s order not to sell DMI assets. He further submits that the two-level increase in his sentence was also based on violation of the same order. According to Mr. Mohammad, this sentence enhancement constitutes improper double counting. He suggests that the situation in
 
 United States v. Stevenson,
 
 6 F.3d 1262 (7th Cir.1993), is analogous to his circumstances. In
 
 Stevenson,
 
 this court found that a two-level adjustment for leadership under § 3B1.1 was improper because the crime of conviction, recruiting a minor to participate in a crime, already encompassed the concept of leadership, and therefore that the defendant was “penalized twice for the same conduct.”
 
 Id.
 
 at 1270. Belying on the analysis in
 
 Stevenson,
 
 Mr. Mohammad asks that we vacate his sentence and remand for resen-tencing.
 

 We cannot agree with Mr. Mohammad’s method of counting. Unlike the
 
 Stevenson
 
 circumstances, the facts here do not involve punishment twice for the same conduct. Mr. Mohammad’s conviction under 18 U.S.C. § 152 resulted from his concealing DMI assets from the bankruptcy trustee and creditors.
 
 See United States v. Key,
 
 859 F.2d 1257, 1260 (7th Cir.1988) (stating that § 152 “prohibits false statements and concealment of assets”). The enhancement under § 2F1.1 recognized that, in addition, he had violated a specific judicial order or the judicial process within the bankruptcy proceedings. Indeed, we rejected an argument quite similar to Mr. Mohammad’s recently in
 
 United States v. Michalek,
 
 54 F.3d 325, 332 (7th Cir.1995). In that case, we recognized that “Section
 
 *1438
 
 2F1.1 is a very broad guideline that covers a variety of crimes involving fraud, deceit, forgery, and certain types of counterfeiting. It necessarily must be adjusted through the use of the specific offense characteristics.”
 
 Id.
 
 at 12, at 331. We then noted the applicability of § 2Fl.l(b)(3)(B) to a conviction for asset concealment because “violations of 18 U.S.C. § 152, in their most basic form, involve a higher level of culpability, and thus deserve greater punishment, than some of the other crimes that correspond to Guideline § 2F1.1.”
 
 Id.
 
 at 332.
 

 Thus we conclude that the two-level increase under § 2Fl.l(b)(3)(B) is not double counting. The district court did not err in applying the enhancement to Mr. Mohammad’s sentence.
 

 (3) Criminal History Point
 

 Mr. Mohammad submits that the sentencing court erred when it calculated his criminal history category. He claims the court mistakenly considered his 1985 guilty plea to a state charge of driving while intoxicated, even though his service of one year of court supervision expunged the conviction. Our review of the sentencing hearing transcript reveals that there was an extended discussion about this previous plea and about whether the record was expunged. However, without resolving that question the government recommended and the court agreed not to consider the 1985 drunk driving conviction in calculating the criminal history. The court then calculated Mr. Mohammad’s sentence with five, rather than six, criminal history points, but noted that his criminal history category remained at three. Therefore Mr. Mohammad’s claim of error is simply mistaken.
 

 (4) Restitution
 

 In this ease the judgment of conviction for Mr. Mohammad and Mr. Saleh states that each defendant is to pay restitution of $3.2 million “in a manner to be determined by the probation officer.” Neither defendant has challenged the order of restitution on appeal. We therefore review it for plain error. Fed.R.Crim.P. 52(b) (“Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.”);
 
 United States v. Seacott,
 
 15 F.3d 1380, 1383-84 (7th Cir.1994) (applying plain error standard when sentencing guideline error raised neither at the trial nor on appeal);
 
 see also United States v. Simpson,
 
 8 F.3d 546, 551 (7th Cir.1993) (following plain error standard of review because defendant failed to object at sentencing to issues raised on appeal);
 
 United States v. Albro,
 
 32 F.3d 173, 174 n. 1 (5th Cir.1994) (per curiam) (concluding that such an order constitutes an unauthorized delegation of authority to a non-Article III judicial officer and therefore affects substantial rights noticeable under the plain error doctrine). For a plain error to warrant reversal, it must affect a substantial right and seriously affect the fairness, integrity or public reputation of judicial proceedings.
 
 United States v. Olano,
 
 -U.S.-,-, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993).
 

 We have made clear that, when a sentencing court “inappropriately delegated] to the probation department its authority to establish a payment schedule” for restitution, the order must be vacated.
 
 United States v. Murphy,
 
 28 F.3d 38, 42 (7th Cir.1994);
 
 see also United States v. Ahmad,
 
 2 F.3d 245, 249 (7th Cir.1993). The fixing of restitution payments is a judicial act.
 
 United States v. Berman,
 
 21 F.3d 753, 759 (7th Cir.1994) (citing cases). “How much the defendant owes, and the extent to which payment may be deferred, is something the judge must decide.”
 
 Ahmad,
 
 2 F.3d at 249. If the court determines that restitution is appropriate, it must fashion an order that takes into consideration the need to provide restitution to victims directly harmed by the defendant’s criminal conduct, as well as the possible “complication and prolongation of the sentencing process” that may result from such an order.
 
 See
 
 18 U.S.C. § 3663(d). Once the court establishes a method of restitution and a payment schedule, the probation office may administer and enforce the order.
 
 Id.
 
 § 3663(h). However, a court abdicates its judicial responsibility when it authorizes a probation officer to determine the manner of restitution. Accordingly, we have vacated
 
 *1439
 
 substantially similar orders.
 
 See United States v. Gio,
 
 7 F.3d 1279, 1292-93 (7th Cir.1993) (remanding case because too much discretion was given to the probation department);
 
 United States v. Boula,
 
 997 F.2d 263, 269 (7th Cir.1993) (same);
 
 accord United States v. Johnson,
 
 48 F.3d 806, 808 (4th Cir.1995) (holding that delegation of authority to determine restitutionary payments would contravene Article III and is therefore impermissible);
 
 United States v. Porter,
 
 41 F.3d 68, 71 (2d Cir.1994) (holding that a sentencing court cannot authorize a probation officer to make post-sentencing decisions concerning amount of restitution or scheduling of installment payments);
 
 Albro,
 
 32 F.3d at 174 (vacating judgment of sentence because district court erred in delegating timing and amount of restitutionary payment).
 
 But see United States v. Barany,
 
 884 F.2d 1255, 1260 (9th Cir.1989) (requiring judicial determination of whether and how much restitution is proper, but allowing delegation to probation officer of questions concerning defendant’s ability to pay and timing and manner of payment),
 
 cert. denied,
 
 493 U.S. 1034, 110 S.Ct. 755, 107 L.Ed.2d 771 (1990). The delegation of this serious sentencing decision from a judicial officer to another deprives the defendant of a substantial right. Under the case law of this circuit, it is a serious structural defect in the criminal proceedings. It seriously affects the integrity of those proceedings. For these reasons, the order of restitution entered against Mr. Mohammad and Mr. Saleh is deficient. As a result, we must vacate the sentence of each defendant and remand with instructions to enter an order consistent with this opinion.
 

 Conclusion
 

 For the foregoing reasons, the judgments of conviction of both defendants are affirmed. The order of restitution of each defendant is vacated and the cases are remanded to the district court for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART, VACATED AND REMANDED in Part
 

 [1]
 

 . In general, a "bust-out” scheme involves the planned fraudulent establishment, operation, and demise of a seemingly legitimate business for the purpose of defrauding the business’ trade creditors. The scheme begins with the formation of a corporation and leasing of warehouse space. The principals build up a favorable credit rating by opening substantial checking accounts, creating a strong balance sheet (perhaps by fraudulent methods), and generally giving the impression of financial strength and stability. They also purchase merchandise and pay for it promptly in order to enhance the company's credit standing. For a period of time, therefore, the business becomes established and builds a good credit history. Once the company can use satisfied manufacturers as a credit reference to obtain larger amounts of goods on credit, it begins amassing inventory. At that point the “bust-out" phase of the business is put in action. The business begins purchasing as much merchandise as it can, and quickly accumulates a huge inventory on credit, with no intention of paying for it. It then sells the goods quickly, at any price, often substantially below the market value. To the creditors the company offers excuses to hide the fact that its inventory is shrinking and that its payments are late. Finally, after selling as much merchandise as possible, the principals declare the bust-out company insolvent. The scheme, described as a "form of planned bankruptcy,”
 
 United States v. Hewes,
 
 729 F.2d 1302, 1307 (11th Cir.1984),
 
 cert. denied,
 
 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), is meant to leave "the mulcted creditors ... to pick over the meatless carcass of an assetless enterprise."
 
 Howell Hydrocarbons, Inc. v. Adams,
 
 897 F.2d 183, 192 n. 6 (5th Cir.1990) (citations omitted). The perpetrators may have lost their credit standing and "good” name, but they reap the monetary benefits for which they had planned.
 
 Id.
 
 This court has reviewed such schemes in the past.
 
 See, e.g., United States v. Robinson,
 
 8 F.3d 398, 413 (7th Cir.1993);
 
 Ashland Oil, Inc.
 
 v.
 
 Arnett,
 
 875 F.2d 1271, 1272 (7th Cir.1989).
 

 [2]
 

 . Mr. Mohammad's defense throughout trial was that, although he was occasionally a salesman for DMI, his actual business was selling gold, and he made a substantial living in that business. The jury believed the government's evidence, however, and convicted Mr. Mohammad on all counts.
 

 [3]
 

 . The government claims that Mr. Mohammad never moved for severance. It explains that, at the status hearings of January 14 and January 19, 1993, Mr. Mohammad orally moved to dismiss the superseding indictment or to continue the trial date, but not to sever. Mr. Mohammad insists that his oral motions did indeed include one for severance. According to the docket sheet, Mr. Mohammad made a motion to sever (dkt. no. 74) and the government responded to that motion on January 21, 1993 (dkt. no. 84). There are no written documents in the record for those entries, and no written denial of Mr. Mohammad’s motion to sever by the court. When such confusion arises, we shall give the benefit of the doubt to the defendant. We therefore assume that the issue of severance was properly raised rather than waived in the district court.
 

 [4]
 

 . No challenge was raised to the propriety of the joinder of defendants under Fed.R.Crim.P. 8(b), and we find no error in the joinder from the face of the indictment.
 
 See United States v. Bruun,
 
 809 F.2d 397, 406 (7th Cir.1987).
 

 [5]
 

 . In
 
 United States v. Buljubasic,
 
 808 F.2d 1260, 1263 (7th Cir.),
 
 cert. denied,
 
 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987), the court wrote: Unless the defenses are so inconsistent that the mtiking of a defense by one party will lead to an unjustifiable inference of another’s guilt, or unless the acceptance of a defense
 
 precludes
 
 acquittal of other defendants, it is not necessary to hold separate trials.
 

 [6]
 

 .
 
 Cf. United States v. Mustread,
 
 42 F.3d 1097, 1107 (7th Cir.1994) (finding no bias in judge’s questions because they were intended to help the jury understand the defendant's confusing testimony).
 

 [7]
 

 .
 
 Cf. United States v. Mitan,
 
 966 F.2d 1165, 1169-70 (7th Cir.1992),
 
 cert. denied,
 
 - U.S. -, 113 S.Ct. 994, 122 L.Ed.2d 145 (1993) (finding that counsel exceeded the limits of zealous advocacy and that the trial judge properly exercised control of the proceeding).
 

 [8]
 

 .The court explained to one of the government attorneys that Mariam Saleh was scheduled to testify before her husband "because of the indisposition of one of the attorneys” or "a weekend health problem.” "And so there was a kind of an agreement, as I understand it, between counsel that they would take this sequence....”
 
 See
 
 tr. at 1608-09.
 

 [9]
 

 . This quotation is apparently a reference to the court’s inquiry of Asad Saleh’s counsel, "Did you get things straightened out?" Tr. at 812.
 

 [10]
 

 . Because Mr. Mohammad was sentenced on October 25, 1993, the sentencing guidelines that became effective November 1992 govern his sentence. Guideline § 3Bl.l(a) provides:
 

 Based on the defendant's role in the offense, increase the offense level as follows:
 

 (a) If the defendant was an organizer or leader of a criminal activity that involved five or
 
 *1436
 
 more participants or was otherwise extensive, increase by 4 levels.
 

 [11]
 

 . Application Note 2 of the Commentary states:
 

 In assessing whether an organization is "otherwise extensive,” all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.
 

 U.S.S.G. § 3B1.1, comment, (n. 2).
 

 [12]
 

 . We note that
 
 Tai
 
 followed
 
 Miller,
 
 the case on which the district court relied. It stated that "[t]oday we take
 
 Miller’s
 
 holding a step further by prescribing that minimum number [of persons needed to permit an enhancement under § 3Bl.l(a)]." 41 F.3d at 1174. '
 

 [13]
 

 . 18 U.S.C. § 152, in pertinent part, provides:
 

 Whoever knowingly and fraudulently conceals from a custodian, trustee, marshall or other officer of the court charged with the control or custody of property, or from creditors in any case under title 11, any property belonging to the estate of a debtor; ...
 

 Shall be fined not more than $5,000 or imprisoned not more than five years, or both.