UNITED STATES of America,
Plaintiff–Appellee,

v.

Ronald L. DAVENPORT and Betty L. Davenport, Defendants–Appellants.

Nos. 90–2500, 90–2501.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1991.

Decided April 9, 1991.

Larry A. Mackey, James M. Warden, Asst. U.S. Atty., Office of the U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Richard L. Darst, Mantel, Cohen, Garelick, Reiswerg & Fishman, Kevin McShane, Indianapolis, Ind., for defendants-appellants.

Before WOOD, Jr., POSNER and MANION, Circuit Judges.

POSNER, Circuit Judge.

A jury convicted Mr. and Mrs. Davenport of having violated 31 U.S.C. § 5324(3), a statute enacted in 1986 to deter people from "structuring" their cash transactions with banks and other financial institutions (we shall, to simplify discussion, call all such institutions "banks") in such a way as to prevent the banks from filing currency transaction reports. The judge sentenced each of them to twelve months in prison.

Sometime before November 5, 1987, the Davenports obtained possession of some $100,000 in cash—how, we do not know. Between November 5 and November 19 they made ten separate cash deposits, each of less than $10,000, totaling $81,500, in multiple branches of two banks in which they had accounts. Banks must report to the Internal Revenue Service any cash deposit above $10,000, and if multiple deposits are made on the same day must aggregate them to determine whether the $10,000 threshold has been crossed. Several of the Davenports' deposits were made in one bank—albeit different branches—on the same day, and therefore crossed the threshold. These deposits were duly reported to the Internal Revenue Service, which sent an agent to question the Davenports. Mrs. Davenport, after being warned that she had a right to remain silent and that anything she said could be used against her, told the agent that the deposits were part of a $100,000 inheritance that her husband had received from his father, who had died three months before the deposits were made. She readily admitted that the, or at least one, purpose of making separate deposits had been to avoid triggering the banks' obligation to report a cash transaction to the Internal Revenue Service. She was herself a bank teller and before making the deposits had inquired about the bank's practice with regard to reporting cash transactions. Mr. Davenport, when questioned (and similarly warned), repeated his wife's story about the inheritance. But whereas she had claimed that he had received the inheritance by check (and then cashed it before being deposited? How very unlikely!) he claimed that the inheritance had been discovered, in the form of cash, in a safe at the house where his father was living at the time of his death. Yet at trial there was evidence that the father had spent the last six months of his life living in a car, had died in poverty, had been buried at public expense, and, as far as anyone knew, had left no inheritance. And nineteen months before the deposits at issue in this case the Davenports had made two other large cash deposits, of $9,000 and of $16,000, on the same day. Mr. Davenport also told the agent that he still had some of the cash from the "inheritance" in the trunk of his car.

The indictment was in twelve counts, and the first issue on appeal is whether this multiplication of counts was proper. Count one charged a conspiracy to violate section 5324(3) and count two charged a violation of the statute itself, a violation consisting of the making of the ten deposits, viewed as an effort to "structure" an $81,500 transaction. The only problem with these two counts is that the Davenports were trying to structure a transaction of $100,000, not $81,500. They just hadn't deposited the last $18,500 when they were caught. But that is a detail of no significance.

The last ten counts charge each of the ten deposits as a separate violation of the statute. These counts should have been thrown out. The statute does not forbid the making of deposits. It forbids the structuring of a transaction. The Davenports received $100,000 in cash, which they wanted to deposit. The receipt and deposit of the $100,000 were the transaction that the Davenports structured by breaking it up into multiple deposits, of which ten had been made when they were caught. There was one structuring, one violation. The government's position leads to the weird result that if a defendant receives $10,000 and splits it up into 100 deposits he is ten times guiltier than a defendant who splits up the same amount into ten deposits. It could, we suppose, be

argued—though the government does not in fact argue—that the more deposits a defendant makes, the smaller each one is likely to be, and that the smaller the individual deposit the less likely the bank is to aggregate them. But against this it can be argued with equal plausibility that a proliferation of deposits increases the probability of apprehension and punishment, by creating a thicker paper trail and reinforcing an inference of evil intent. Unable as we are to say that a defendant's conduct is more dangerous the greater the number of deposits, we are unable to construct any rationale for the government's position.

We can find no case in which the issue of the unit of violation of section 5324(3) has been discussed; but our impression is that until this case the practice was to charge a single count of structuring. *United States v. Scanio*, 900 F.2d 485, 487 (2d Cir.1990). We conclude that the structuring itself, and not the individual deposit, is the unit of crime.

██ Although the judge imposed concurrent sentences, our practice in vacating a conviction underlying a concurrent sentence is to remand for resentencing on the valid counts. The idea behind the practice is that the judge may have sentenced the defendant more heavily on those counts thinking erroneously that he was guilty of additional crimes. *United States v. Boulahanis*, 677 F.2d 586, 591 (7th Cir.1982). Whether the practice makes sense in the age of the Sentencing Guidelines may be questioned, but need not be decided here since the judge made clear that the sentences on the first two counts were independent of the sentences on the remaining ten counts, which she viewed as an alternative way of conceptualizing the defendants' offenses rather than as additional crimes committed by them.

██ But all this assumes that the convictions on counts one and two are valid, and this issue we must now examine. The Davenports' opening shot is that they committed no offense because they avoided, rather than evaded, the reporting requirement. Evaluating this argument requires a closer look at the statute. It provides that "no

person shall for the purpose of evading the reporting requirement of section 5313(a) [of Title 31] with respect to such transaction— (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) ... [or] (3) structure ... any transaction with one or more domestic financial institutions." 31 U.S.C. § 5324. Section 5313(a) in turn requires banks and the other covered financial institutions to comply with such reporting requirements for cash transactions as the Secretary of the Treasury shall establish. In November 1987, as today, the Secretary's regulations, in addition to the basic requirement that banks report any cash transaction (usually a deposit) in excess of $10,000, only required a bank to aggregate the cash deposits made by a person "during any one business day," for purposes of determining whether the $10,000 threshold had been crossed. 31 C.F.R. § 103.22(a)(1). Except for the slip up in which the Davenports made deposits in a bank and its branches on the same day, the banks were not required to file currency transaction reports. From this the Davenports infer that they were not (except for that embarrassing slip) evading the reporting requirement, but merely avoiding it. They draw an analogy to the distinction between tax avoidance ("tax planning" is the euphemism), which is lawful, and tax evasion, which is not. They point out that it was not till later that a regulation was added stating that "the transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring." 31 C.F.R. § 103.11(p); *Amendment to the Bank Secrecy Act Regulations Relating to Domestic Currency Transactions*, 54 Fed.Reg. 3023 (Jan. 23, 1989).

They misunderstand section 5324(3), the specific provision under which they were charged. It is not a statute for punishing the cash depositor as an aider and abettor of a bank's violation of the reporting requirement. The target of the statute was not banks, or cash transactors viewed as the accomplices of banks in violating the

requirements that the Treasury Department imposes on banks. The target was the transactors—the "money launderers," a term we use broadly to denote persons desiring to convert "hot," suspiciously large, or easily traced cash sums into more discreet media of exchange—themselves. The statute's aim was to prevent people from either causing the (usually innocent) bank to fail to file a required report or defeating the goal of the requirement that large cash deposits be reported to the Internal Revenue Service by breaking their cash hoard into enough separate deposits to avoid activating the requirement. S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986); *United States v. Scanio, supra,* 900 F.2d at 488. The first subsection of the statute strikes at the first abuse and might have been violated by the Davenports' splitting up a deposit of $10,000 or more between branches of the same bank—an attempt to cause the bank not to file a required report. The third subsection strikes at the dominant form of the Davenports' misconduct by forbidding the structuring of a transaction for the purpose of evading the reporting requirement; that is, by forbidding the breaking up of the transaction (here the deposit of $100,000 in cash) into small enough pieces not to trigger the requirement. Far from authorizing the Davenports' conduct, the one-day regulation facilitated it, by giving them what they thought was a safe haven: if they avoided multiple deposits on the same day (which they didn't quite, and so their scheme failed), the banks would not report their deposits and they would have succeeded in concealing the transaction from the Internal Revenue Service. It was to defeat such tactics, fairly described as evasive, that subsection (3) was added to the statute. The Davenports read it out of the statute by arguing that they cannot be guilty if the bank was not required to file a report. They thereby contract the statute to its first subsection.

Tax avoidance is lawful; money laundering is not. The "evading" of which section 5324(3) speaks is the attempt to split up a cash hoard in such a way as to defeat the government's efforts to identify money launderers. The Davenports are not people trying to minimize their taxes by finding such loopholes as the law allows. They are people who are trying to conceal the existence of a large amount of cash from the government.

The Davenports argue that the statute was unconstitutionally vague until the Treasury added a definition of "structuring" to its regulations (after they committed their crimes). The word "structuring" is one of those vague modern words like "conceptual" and "implicate" (in the sense in which this case might be said to "implicate" the concern with vague statutes) that lack precise meaning and are used mainly to impress; but here the statutory context gives the term an exact meaning. When read together with subsection (1) and the basic requirement of evasion, "structur[ing] any transaction" means altering the form of the transaction in order to avoid activating the bank's duty to file a currency transaction report. The government concedes, moreover, that the statute requires it to prove that a defendant knew the reporting requirements and was deliberately seeking to evade them by multiple deposits (or withdrawals). It is difficult to see how a statute that requires such knowledge as a predicate for conviction could be unconstitutionally vague, *Screws v. United States,* 325 U.S. 91, 104, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945) (plurality opinion); cf. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), since the defendant who because of its vagueness did not understand what the statute meant would not have the requisite knowledge and therefore could not be convicted. To insist on too much precision would merely open up a new set of loopholes.

The defendants complain about the admission of the statements that they made to the agents, particularly the statements that cast doubt on their story that the $100,000 was an inheritance, including such evasive statements (or nonstatements) as Mrs. Davenport's refusal to give the agent the name of her husband's father.

The Davenports say it is irrelevant to their guilt of the crime of which they were charged where they got the money. It is not irrelevant. The shadier the source, the greater the Davenports' motive to conceal the money from the authorities by taking measures to thwart the reporting requirements. If it really had been an inheritance, they would have had no incentive to conceal it from the Internal Revenue Service, since it was too small to create any estate tax liability. True, this assumes that the alleged bequest to Mr. Davenport was the entire estate—and there might have been other bequests, in which event the estate might have been large enough to owe estate tax, and such tax would be chargeable against the beneficiaries, who might all decide to try to structure the bequests (if they were large, and in cash) to avoid reporting by the banks and thereby beat the estate tax. But these speculations really do carry us into cloudcuckooland.

If, however, the cash was stolen, the Davenports would have every incentive to conceal it, if only because stolen money is taxable income. So the fishiness of the inheritance story was circumstantial evidence that the structuring was done with the evasive purpose that the statute requires for liability.

■ But the Davenports say that the admission of their statements, even if proper under Fed.R.Evid. 404(b) to show intent (as we think it was), violated their constitutional rights (1) not to be forced to incriminate themselves and (2) not to be enticed into doing so by being promised that they could keep silent, implying that silence—illustrated by Mrs. Davenport's refusal to name her father-in-law—would not be used against them. The first right is the famous right against compulsory self-incrimination, the second a right that the Supreme Court has found implied in the due process clause in such cases as *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).

■ 1. The Davenports were told that they didn't have to answer the agent's questions. As they were not in custody, there was no implicit threat if they kept mum. They decided to answer the agent's questions, no doubt hoping that they could satisfy him and ward off further investigation. As an original matter, we would incline to the view that once they started down this path of self-exculpation, any statement they made—including "I won't tell you"—was fair game. It is true that in *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017–18 (7th Cir.1987), we held that it violates the self-incrimination clause to allow into evidence testimony that the defendant refused to give a statement to the police when first approached by them. As in this case, there was no implicit threat based on a custodial situation. On the other hand the defendant had not started down the self-exculpation road. The defendants in this case did start down that road, which therefore brings it closer to the cases that forbid the claim of privilege if to accept it "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony." *Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951). See also *Klein v. Harris*, 667 F.2d 274, 287–88 (7th Cir.1981). From these cases grows the principle that a witness who makes an incriminating statement cannot use the privilege against compulsory self-incrimination to block cross-examination by claiming that his answers to the cross-examining lawyer's questions may incriminate him. *Brown v. United States*, 356 U.S. 148, 155–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *United States v. Herrera–Medina*, 853 F.2d 564, 567–68 (7th Cir.1988). This case is different because the Davenports were not witnesses when questioned; nor did they seek to place the self-serving parts of their statements in evidence—in fact neither defendant took the stand. But the underlying principle could be thought the same. The privilege against self-incrimination is not a privilege to attempt to gain an advantage in the criminal process, whether in its investigatory or its trial stage, by selective disclosure followed by a clamming up. Having voluntarily given the agent their version of the events, the Davenports

forfeited their privilege not to answer questions concerning that version.

We are given pause, however, by the sharp distinction that the Supreme Court drew in *Miranda v. Arizona*, 384 U.S. 436, 476 n. 45, 86 S.Ct. 1602, 1629 n. 45, 16 L.Ed.2d 694 (1966), between the situation of a witness (*Rogers*) and that of a person undergoing interrogation. The Court thought the former a far likelier setting for an attempt by the person being questioned to make self-serving statements. And it is true that the Davenports' statements, to the extent exculpatory, would not have been admissible at their trial; they would have been hearsay statements not coming within any of the exceptions to the hearsay rule. Still, the Davenports were seeking an advantage from selective disclosure— they were trying to get the Internal Revenue Service to end its investigation. It is true that *Miranda* holds that it is not a waiver of constitutional privilege for a person who is in custody to begin answering questions and then clam up. *Id.* at 475–76, 86 S.Ct. at 1628–29. See also *Rowan v. Owens*, 752 F.2d 1186, 1190 (7th Cir.1984). But the Court's emphasis was on the coercive characteristics of custodial interrogation. The Davenports were not in custody when they were questioned.

2. What about the questions the Davenports *didn't* answer, such as the question asked Mrs. Davenport what her father-in-law's name was? The agent did not compel her to answer. But at trial the prosecution used her refusal to answer against her. Did the government by doing so break the agent's promise that she didn't have to answer his questions, implying that her silence would not be a subject of comment at trial? If she had said she wouldn't answer his questions, that would have been the end of it; and having told her that she didn't have to answer his questions, the agent could not have commented on her silence at the trial. But had she a privilege to weave a tapestry of evasions? Or, once she began answering questions about the offense, was it too late to rewind the tape? The agent had not said, "If you answer my questions and when you're through repent your decision to talk to me, I won't testify about our conversation." He gave her the option not to answer his questions and it is arguable that when she declined it, all bets were off; that no understanding was violated when he testified to the full range of her answers, including refusals to answer. Cf. *Phelps v. Duckworth*, 772 F.2d 1410, 1412–13 (7th Cir.1985) (en banc).

The analysis is thus similar to that under point (1), which means that it suffers from the same doubts induced by *Miranda*. We do not think those doubts fatal; outside the coercive setting of a custodial interrogation, willingness to answer some questions can properly be given greater weight in deciding whether that willingness should forfeit the right to object to comment on a refusal to answer a particular question. But if this is all wrong and there was error here, it was harmless beyond a reasonable doubt, as we are authorized though not required to notice notwithstanding the government's failure to argue the point. *United States v. Giovannetti*, 928 F.2d 225 (7th Cir.1991) (per curiam). No rational jury could have acquitted either defendant even if the jury believed the story about the inheritance. Long before they clammed up, the Davenports admitted that they had acted with the intention of preventing the filing of currency transaction reports.

The judgment is modified to vacate counts three through twelve of the indictment and the convictions and sentences based on those counts, and as modified is affirmed.

MODIFIED AND AFFIRMED.