**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kermit GABEL, Defendant–Appellant.**

No. 94–3425.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1995.

Decided May 30, 1996.

Joseph Hartzler, Timothy Bass (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff-Appellee.

Howard W. Feldman (argued), Feldman & Wasser, Springfield, IL, for Defendant-Appellant.

Before POSNER, Chief Judge, and BAUER and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

For an apparently significant period of time, Kermit Gabel made a living by stealing other people's property, disposing of the stolen goods in various creative ways, and laundering the proceeds. In 1993, however, the law caught up with him (not for the first time), and he was indicted by a federal grand jury on eleven counts, most of which related to illegal structuring of transactions or money laundering. He pleaded guilty to two of those counts, and he now appeals, asserting that the district court committed several errors at the sentencing stage. Although we find no merit to Gabel's challenges to his offense level or fine, we agree that the district court erred when it increased his criminal history category by three points based on a 1974 conviction, pursuant to U.S.S.G. § 4A1.2(e)(1). We therefore vacate the sentence and remand for further proceedings.

**I**

In his plea agreement, Gabel admitted to the following facts that supported his conviction. From July 1988 until his arrest on February 7, 1993, he burglarized private homes and stole jewelry and silver goods. He arranged for several shipments of stolen goods to be shipped from Illinois to a purchaser in Louisiana, and he had one shipment transported interstate to a Minnesota purchaser. Both purchasers paid for the goods by check. When Gabel received the checks, he deposited them in bank accounts under the name "Roy Post." The record reflects at least two "Roy Post" bank accounts used by Gabel in Illinois: an account at Bank One of Springfield, Illinois and an account at First National Bank, also in Springfield.

On January 8 and 9, 1992, Gabel "structured" the withdrawal of $15,000 in currency from the "Roy Post" account at Bank One by withdrawing equal amounts of $7,500 on each of the two days. At that time, Gabel knew of Treasury Regulation 31 C.F.R. § 103.22(a) which requires domestic financial institutions to file a Currency Transaction Report with the Secretary of the Treasury whenever the institution pays, receives or transfers $10,000 or more in U.S. currency. Gabel structured his withdrawals to evade that requirement. On or about April 27, 1992, Gabel used a fake Social Security number to open an account in the name of "Roy Post" at First National Bank. He then arranged for the transfer of $100,286.03 from the Bank One account to the new First National account, hoping further to obfuscate the location, source and ownership of the money. Gabel knew that he had deposited the proceeds from the sale of stolen goods into the Bank One accounts, and that the total of those deposits exceeded the amount that he transferred to First National.

On February 7, 1993, Gabel was arrested in Macon Co., Illinois, after the Decatur police became suspicious about his possible involvement in a string of burglaries that took place in Decatur on February 5. On December 15, 1993, Gabel was charged in a federal superseding indictment with five counts of illegal structuring of transactions, in violation

of 31 U.S.C. § 5324(a)(3), two counts of illegal monetary transactions, in violation of 18 U.S.C. § 1957, three counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and one count of illegal transportation of stolen goods, in violation of 18 U.S.C. §§ 2 and 2314. Pursuant to a written plea agreement, Gabel pleaded guilty to Counts 1 (structuring) and 8 (money laundering) of the indictment, which the court accepted on March 24, 1994. Sentencing was set for October 3, 1994.

## II

After the court accepted Gabel's guilty plea, it ordered the preparation of a Presentence Report (PSR). As part of the presentence investigation, the probation office conducted an extensive analysis of Gabel's financial condition and background. This turned out to be an iterative process. Gabel initially spoke with the probation officer and, with the officer's help, completed certain forms that inquired about his finances. The officer also left him some forms to complete on his own and to return to the probation office. Finally, Gabel furnished the probation department with forms that authorized the release of his financial information. Upon completing its initial analysis of the information Gabel had provided, the probation officer and the prosecutor requested an additional interview with him. According to Gabel, a detailed follow-up interview in fact took place.

In the PSR, the probation office concluded that Gabel had failed to disclose some of his assets, including his ownership interest in unredeemed U.S. savings bonds, two bank accounts and his Social Security income. In addition, the office concluded that Gabel did not adequately disclose his equity interest in an airplane and in certain real estate. Throughout the investigation, in the opinion of the probation office, Gabel was attempting to minimize his financial resources, stating at one point that the FBI had seized all his assets. The PSR indicated that Gabel had willfully withheld information pertaining to the checking accounts and the Social Security payments in the hopes that they would remain undetected. On this basis, it recom-

mended a two-level enhancement to the base offense level for obstruction of justice, under U.S.S.G. § 3C1.1.

After reviewing the PSR and the various objections filed by the government and Gabel, the district court determined that Gabel would be sentenced pursuant to a total offense level of 22 for Counts 1 and 8. The guideline for a conviction under 31 U.S.C. § 5324(a)(3) (structuring) provides for a base offense level of six, plus the number of offense levels from the table in U.S.S.G. § 2F1.1 corresponding to the value of the funds. Since Gabel was found to be responsible for structuring $83,500, the base offense level was increased six levels. U.S.S.G. § 2F1.1(b)(1)(G). Further, since Gabel knew the funds were proceeds of an unlawful activity, the base offense level for the structuring was increased by another two levels. U.S.S.G. § 2S1.3(b)(1). Finally, the court enhanced Gabel's offense level by two points for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Thus, Gabel's base offense level for the structuring count was 16. The initial base offense level for the money laundering count, 18 U.S.C. § 1956(a)(1)(B)(i), is 20. U.S.S.G. § 2S1.1. Because the value of the funds laundered was $590,822, the base offense level was increased by three levels. U.S.S.G. § 2S1.1(b)(2)(D). Gabel further received a two level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Finally, the court gave Gabel a three level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. This resulted in a base offense level of 22 for the money laundering count. For purposes of determining the final base offense level, Counts 1 and 8 were grouped pursuant to U.S.S.G. §§ 3D1.2(b) and 3D1.3(a).

The government initially presented three grounds for the obstruction enhancement pursuant to U.S.S.G. § 3C1.1: first, Gabel attempted to escape from custody; second, he failed to inform the probation office of $15,500 in U.S. Savings Bonds; and third, he failed to disclose the existence of the two checking accounts and the social security payments. The district court did not rely on either of the first two, principally because the government advised the court that the evi-

dence was insufficient to support an obstruction enhancement on those grounds. The government has not tried to support the enhancement on these alternative grounds on appeal. The district court was satisfied, however, that Gabel's failure to disclose the two bank accounts (representing a total of $2,500) and the social security income ($356 monthly) was deliberate. Notably, the prosecutor did not believe it was a willful omission: he advised the court that it was more plausible that Gabel merely forgot about those assets.

On appeal, Gabel argues that the court clearly erred in finding that his omission was willful, and that the court supported its finding with nothing more than unsupported speculation. The government, now taking the opposite tack from the one it took at sentencing, argues that the district court had the discretion to overrule any objections to the PSR that were made, and that the record shows that the district court did not clearly err in its determination.

■ Our starting point here is the statute permitting appellate review of sentences, 18 U.S.C. § 3742, which requires us to determine whether a sentence was imposed "in violation of law" or "as a result of an incorrect application of the guidelines." § 3742(e)(1) and (2). As we have frequently noted before, this means that we must uphold the district court's findings of fact unless they are clearly erroneous. *United States v. Gist,* 79 F.3d 52, 53 (7th Cir.1996); *United States v. Adames,* 56 F.3d 737, 748 (7th Cir.1995); *United States v. Mohammad,* 53 F.3d 1426, 1435 (7th Cir.1995) citing *United States v. Billops,* 43 F.3d 281, 287 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995). As part of that process, we look to see whether there is any evidence in the record supporting the district court's finding. This Court will only disturb the sentencing court's factual findings if our review of the evidence as a whole leaves us with the definite and firm conviction that a mistake has been committed. *Mohammad,* 53 F.3d at 1435 citing *United States v. Mustread,* 42 F.3d 1097, 1103 (7th Cir.1994).

The obstruction of justice guideline, § 3C1.1, provides as follows:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

In this case, the only question is whether Gabel's failure to disclose the bank accounts and Social Security payments was willful, as the PSR claimed, or inadvertent, as he asserted. In his brief, Gabel notes that the government never asked about the accounts. In fact, he evidently left Ohio in a hurry after being convicted of a crime but before sentencing, and as he candidly says in his brief, he "was not going to be checking on historical accounts which would allow him to be traced." He had no need for such small sums of money, because he had large sums of cash available until his arrest in Illinois on burglary charges and the subsequent seizure of his money and properties.

The district court drew the opposite inference from Gabel's prior financial history. Gabel, it pointed out, "is a sophisticated financial planner with numerous financial holdings." He pleaded guilty to crimes that required him to have "intimate knowledge of banking procedures and also require[d] several different locations" to hide the money. Furthermore, Gabel had gone to some trouble to avoid having the government seize his financial interests. The court concluded with these observations:

The Court is firmly convinced that Defendant is not a person who forgets about money. Having made the statement, the Court will give Defendant the benefit of the doubt on the checking accounts. Perhaps Defendant simply forgot about the accounts, although the Court doesn't find that to be likely. The Court, however, will not find that Defendant forgot about his monthly social security payments. Defendant specifically applied for these social security benefits and began receiving payments from the Social Security Administration in February 1992. It is simply unbelievable that Defendant would forget about such benefits. Thus, the Court finds that Defendant knowingly and willfully failed to disclose his social security pay-

ment to the probation office in hopes that the payments would remain undiscovered. Following Application note 3(h) to U.S.S.G. § 3C1.1, which lists "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" as one example of the type of conduct to which the obstruction enhancement applies, the court imposed the two-level increase specified in the Guideline.

■ The issue here is not, as Gabel would have us believe, whether the district court erred by speculating without proper foundation about additional assets that Gabel might have had. That point is relevant, if at all, to the appropriateness and size of the fine. Everything but Gabel's state of mind is clear: he did have the Social Security payments, he did not disclose them to the probation officer, and they did fall within the scope of the government's request for information. The district judge had to decide whether or not to believe Gabel when he claimed that his nondisclosure was inadvertent. Short of peering into Gabel's mind, the only way to do this is to look at the kinds of circumstantial factors on which the court relied. Gabel had proven to be quite adept in manipulating numerous sources of income through various bank accounts. His application for the Social Security benefits was not something from his distant past, but instead occurred almost contemporaneously with the two offenses to which he pleaded guilty. As in *United States v. Larsen*, 909 F.2d 1047 (7th Cir. 1990), the question of Gabel's intent was a factual dispute that required the district court to make a credibility determination. See *United States v. Garcia*, 69 F.3d 810, 815 (7th Cir.1995) (clear error review of a district court's finding that a defendant obstructed justice within the meaning of § 3C1.1); *United States v. Wright*, 37 F.3d 358, 361 (7th Cir.1994) (same); *United States v. Sauerwein*, 5 F.3d 275, 278 (7th Cir.1993) (district court's finding that defendant's conduct evidenced an intent to carry out his threat is one of fact that is reviewed for clear error); *United States v. Song*, 934 F.2d 105, 109 (7th Cir.1991). Looking at the totality of Gabel's behavior, including particularly his lack of cooperation with the presentence investigation, the court was entitled to conclude that

the omission of the Social Security benefit payments was willful. At the very least, we see no clear error in such a conclusion.

## III

The PSR also recommended a three point increase in Gabel's criminal history level, based on a 1974 conviction for interstate transportation of falsely managed and forged securities, forgery of U.S. Savings Bonds, aiding and abetting the first two offenses, and mail fraud. Gabel received a four year sentence of imprisonment for those offenses, but he was paroled on December 20, 1975. For purposes of computing criminal history, the Sentencing Guidelines impose a cut-off period for prior sentences, in U.S.S.G. § 4A1.2(e)(1):

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

Application Note 8 to § 4A1.2 explains that, as used in subpart (e), the term "commencement of the instant offense" includes any relevant conduct, as defined in U.S.S.G. § 1B1.3. That section defines relevant conduct as

> (a)(1)(A) all acts and omissions committed, aided, abetted, commanded, induced, procured, or willfully caused by the defendant;
> . . .
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . .

The question here is whether the burglaries and thefts to which Gabel admitted in his plea statement were "relevant conduct" for purposes of the structuring and money laundering offenses.

The burglaries and thefts are crucial for Gabel's criminal history because of the fif-

teen-year rule of § 4A1.2(e)(1). As noted above, Gabel was convicted in the Northern District of Oklahoma at Tulsa on March 29, 1974, and he was paroled on December 20, 1975. If the present "offense of conviction" did not begin, for relevant conduct purposes, until some time after December 20, 1990, then the 1974 offense was too remote in time to satisfy the criteria of § 4A1.2(e)(1). It is undisputed that the indictment specifically charges in Count 1 that the structuring transaction occurred on January 8–9, 1992, and in Count 8 that the money laundering occurred on April 27, 1992. Conduct "during" the commission of the offense of conviction, or taken to avoid the offense of conviction, would by definition be too late. The question therefore is whether, as the government argues, the burglaries and thefts were acts committed "in preparation for" the offenses of conviction.

 We begin by considering the elements of a structuring and a money laundering offense. In order to prove structuring, the government had to show that (1) Gabel knew of the relevant reporting requirements, (2) he structured his transaction for the purpose of evading those reporting requirements, and (3) he acted with knowledge that his conduct was unlawful. 31 U.S.C. § 5324(a)(3). See *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *United States v. Davenport,* 929 F.2d 1169 (7th Cir.1991), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992). The subsection of the money laundering statute under which Gabel was charged, 18 U.S.C. § 1956(a)(1)(B)(i), makes it a crime to conduct a financial transaction knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds. *United States v. Reynolds,* 64 F.3d 292, 297 (7th Cir.1995); *United States v. Koller,* 956 F.2d 1408, 1411 (7th Cir.1992). We take these statutes one at a time, to see if the acquisition of the property that later furnishes the proceeds is a part of either offense.

 It seems plain that the illegal conduct that furnishes the money that is later involved in a structuring transaction is not part of the structuring offense itself. As this Court explained in *Davenport,* the purpose of § 5324(a)(3) is "to prevent people from either causing the (usually innocent) bank to fail to file a required report or defeating the goal of the requirement that large cash deposits be reported to the Internal Revenue Service by breaking their cash hoard into enough separate deposits to avoid activating the requirement." 929 F.2d at 1173. The reporting requirement is central to this offense; it would make no difference to the Treasury if someone illegally structured a transaction to avoid reporting an exceptionally generous gift that fell above the $10,000 threshold, or if she wanted to avoid reporting the receipt of illegal proceeds. Thus, the fact that the source of Gabel's money was his earlier spate of burglaries and thefts is immaterial to § 5324(a)(3). Opening several bank accounts, acquiring a false identification, or creating a shell corporation might qualify as preparatory acts, but there was no need to commit burglaries in order to be ready to "structure." Conversely, if Gabel had been more immediately materialistic, he might have spent more of his illegally acquired money purchasing tangible assets, such as cars, real property, or luxury goods. In light of the elements of the structuring offense, Gabel's admitted burglaries and thefts cannot be considered as preparatory actions within the meaning of U.S.S.G. § 1B1.3(a)(1).

 The government cites *United States v. Eske,* 925 F.2d 205 (7th Cir.1991), for the proposition that Gabel "commenced" structuring (within the meaning of § 4A1.2(e)(1)) when he engaged in the unlawful activity that generated the illegally manipulated funds. Thus, the government argues that the 1988 burglaries should be considered part of the offense of conviction (structuring) within the meaning of § 1B1.2(c). However, Gabel's plea statement, unlike the one discussed in *Eske,* did not "specifically establish the commission of additional offenses" within the meaning of § 1B1.2(c). Rather, his statement generally identified the illegal source of the structured funds. This general statement of illegal activity contained in the plea

statement cannot be considered a "stipulation" of prior crimes that will trigger "commencement" within the meaning of the Guideline.

▮▮▮▮▮ Although at first blush the money laundering case looks closer, in the end we are convinced that the logic of *Davenport* controls here as well. The indictment charged that the "specified unlawful activity" that gave rise to the proceeds was the interstate transportation of stolen property, and that Gabel knew that the property represented proceeds of some form of unlawful activity. The plea statement does not specify when, during the period between July 1988 and February 1993, Gabel "caused" the shipments of stolen goods to be transported interstate to Louisiana and Minnesota. Thus, nothing in the statement would support a claim that Gabel admitted to specific relevant conduct prior to December 20, 1990.

The offense of money laundering is the act of designing a transaction to conceal or disguise the nature or other identifying features of the property. This Court has held that the government is not required to trace the proceeds to a particular sale. *United States v. Jackson,* 983 F.2d 757, 766 (7th Cir.1993). Put differently, this offense focuses on the conversion of the fruits of the earlier crimes into other, presumably less detectable, forms. The particular nature or time of those earlier crimes is immaterial. Only when the effort to conduct the financial transaction described by the statute begins does the relevant conduct commence for money laundering itself. Before that, an individual has simply committed burglary, drug dealing, bank robbery, or any of the myriad illegal activities that might lead to ill-gotten wealth. Cf. *United States v. Rodriguez,* 53 F.3d 1439, 1447 (7th Cir. 1995) (prosecution must only show either actual or constructive knowledge of the tainted source of funds laundered to support a conviction under § 1956(a)(1)(B)(i)); *United States v. Hardwell,* 80 F.3d 1471 (10th Cir. 1996); *Tenth Survey of White Collar Crime: Money Laundering,* 32 Am.Crim.L.Rev. 499 (1995). While the statute requires that the money laundered be the fruit of an illegal act, there is no requirement that the government link the money laundered to a specific

criminal act. Thus, the commission of the illegal acts cannot be considered the "commencement" of the charged offense.

We therefore conclude that the burglaries and thefts to which Gabel admitted, which took place from 1988 until his arrest, do not constitute relevant conduct for the structuring or money laundering offenses. Without any other evidence of relevant conduct that occurred before December 20, 1990, the district court should not have added the three points to Gabel's criminal history based upon the 1974 conviction. The extra points put Gabel in the Criminal History Category VI, and resulted in an imprisonment range of 84 to 105 months. Without them, he would have been in Criminal History Category V, and subject to a sentencing range of 77 to 96 months. Since the court imposed concurrent sentences of 104 months on Count 8 and 60 months on Count 1, it is plain that this error was material.

### IV

▮▮▮▮▮ ▪ Last, we consider Gabel's challenge to the $50,000 fine that the district court imposed. His attorney points out that he was 63 years old at the time of his sentencing, that he was currently serving a 20 year sentence imposed by the State of Illinois for burglaries, and that "a substantial portion" of his assets were seized by the United States and forfeited. His only source of income is the Social Security payments. Gabel concedes that it is his burden to establish that he cannot pay a reasonable fine, but he urges us to overturn the district court's findings of fact on the ground that there is no evidence to support them.

The district court looked to a number of possible sources of money that Gabel might be able to tap. First, the court noted that Gabel transferred his unencumbered title in an airplane worth $20,000 to $30,000 to another individual following his arrest in this case. The other individual has agreed not to sell the plane pending resolution of Gabel's case, and the government was prepared to seek to void the transfer so that the equity in the plane would be available for the fine. Second, Gabel purchased U.S. Savings Bonds worth more than $15,000 in 1992, which have

not been redeemed. Although there was some indication that Gabel had transferred them to another person, the court thought that he might be able to recover them and use them for the fine. Third, the court found that Gabel had transferred his title to certain real properties in Ohio with an equity in excess of $85,000 to his girlfriend when he fled from the Ohio authorities. If the girlfriend returns them, they would also be available. The court also mentioned two or three other potential sources of money, ending the list with the $356 monthly social security checks. Looking at the overall record, and again taking into account Gabel's financial creativity, the district court concluded that Gabel had the wherewithal to pay the $50,000 fine. Interestingly, the court waived the interest requirement on the fine.

Although the matter is close, we cannot say that the district court clearly erred in this finding. It was based on the court's belief that Gabel himself was responsible for sheltering significant sources of income, and that it was within his power to undo that which he had done. Gabel's fine was based on an accurate calculation of his offense level, and nothing in this opinion affects that calculation. Therefore, there is no reason for the district court to revisit the calculation of Gabel's fine. However, we note that the district court stated an incorrect fine range in its judgment. Because Gabel's offense level was 22, his fine range should have been $7,500 to $75,000, not $10,000 to $100,000. Since the fine assessed was well within the correct range, the district court's error in stating the applicable range was harmless.

For the reasons stated, we accordingly VACATE the sentence and REMAND for re-sentencing in accordance with this opinion.