In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2192

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VERNON BONNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 00 CR 55—**Rudy Lozano**, *Judge.*

ARGUED JANUARY 11, 2002—DECIDED SEPTEMBER 13, 2002

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* A jury found Vernon Bonner guilty of four counts of mail fraud and one count of theft of government funds, after he swindled a widow out of her spousal and dependent Veterans Administration (VA) benefit payments. The court denied his motion for a new trial. On this direct appeal, Bonner contends that the district court committed several errors in the handling of testimony at trial. Finding no error, we affirm his conviction.

**I**

While living in Brazil, James Kettles, an expatriate American armed forces veteran, met a Brazilian national, Angelita. The two were eventually married and lived mainly on James's VA benefit payments. After James's death in 1992, Angelita was entitled to receive survivor and dependent benefits from the VA as the widow of a war veteran with dependent children. For some reason, however, after it learned of James's death, the VA failed to begin making the proper survivor/dependent payments (although it did terminate his direct benefits). Concerned, Angelita traveled to the United States to find out what was wrong and to secure the benefits she was due. In part because of her limited command of English, she was helped in this process by Dean Blake, a family friend. The trip proved fruitless, and Angelita returned to Brazil and went on with her life, relying chiefly on savings that her husband had left in a New York bank account.

Enter Vernon Bonner. Before James and Angelita were married, they met Bonner, who was visiting Brazil. In 1993, Bonner was again vacationing in Brazil, and he paid a visit to Angelita. At that time, he learned of James's death and of Angelita's problems with the VA benefits. Bonner offered to help her get the benefits reinstated. During another trip to Brazil in 1994, Bonner asked Angelita to provide him with copies of her marriage certificate and license, James's burial documents, and the children's birth certificates. To further her cause with the VA, Bonner also asked Angelita to sign several papers, including a power of attorney, that were written in English.

In 1994, Angelita started receiving checks from the VA once again. She received an $8,000 check for benefit payments that were overdue as well as one more check. Then, from her point of view, the checks again ceased

arriving. This was because Bonner, armed with the power of attorney, asked the VA in August of 1994 to send all benefits due Angelita to a post office box that he had set up in Gary, Indiana. In 1995, Bonner filed a request that Angelita's benefit payments be directly deposited in his bank account in Chicago.

In 1995, Bonner notified Angelita that she would be receiving a check for approximately $33,000 from the VA. He asked for a 20% cut of that check for his expenses. Not suspecting anything yet, when she received the check in November 1995 she sent Bonner some $3,000 in compensation. Bonner then contacted the VA, fraudulently claiming that the $33,000 check made out to Angelita had been lost and should be re-sent to his address in Indiana. The VA took him at his word and sent him another check on November 20, 1995, which he deposited in his Chicago bank account.

Angelita thought it odd that after she received the $33,000 check, she was once again no longer receiving any current benefits. Instead of going through Bonner, this time she asked the VA directly about the cessation of her benefit payments. The VA responded that her benefit payments were being sent to her attorney-in-fact, Vernon Bonner. Angelita took another trip to the VA in New York to sort matters out, and for a time she again was receiving the check due to her. In March 1996, the VA noticed that two copies of the same $33,000 check had been cashed and asked Bonner for an explanation as well as repayment of the amount improperly deposited. (Angelita was not notified at that time that two copies of the check had been deposited.) Bonner suggested to the VA that it should merely suspend sending further checks to Angelita until the overpayment had been recouped. The VA agreed and stopped sending the checks to Angelita in July 1996. That was the first time it told Angelita about the double cashing of the $33,000

check. The VA opened a criminal investigation into the matter, and Angelita received no more checks until December 1999.

In conjunction with the investigation over the cashing of both checks, Bonner and Angelita were both asked to provide handwriting exemplars. Bonner declined to speak with investigators, but he did produce the handwriting exemplars in response to a grand jury subpoena. He did this on April 14, 1998, at the Hines VA medical center in Illinois. Agent Bryan Penton, who was present during those proceedings, had earlier received a mail package from Bonner, which contained postal receipts, the power of attorney, and a letter from Bonner to the VA concerning the status of Angelita's inquiries. Bonner declined to discuss these items with Agent Penton.

At trial, the jury heard competing tales of these events. Bonner painted himself as a friend of the family who had had an intimate relationship with Angelita and who loaned her substantial sums of money over the years. He contended that he was merely helping her receive her benefits and repaying himself for the loans along the way. Angelita's story was that Bonner was a casual acquaintance of her husband who occasionally would stop by the couple's place in Brazil. Upon her husband's death, she contended, Bonner took advantage of his position as a supposed friend of the deceased to bilk her, convincing her that he was going to help her with the benefits and instead robbing her of what she was due. While Angelita acknowledged that Bonner had, at one point, made her a $150 loan, she contended that she had repaid it with interest.

A string of witnesses took the stand, some of whom figure in Bonner's appeal. Angelita's character was bolstered improperly, he claims, by the testimony of Claudia Grahamm, an acquaintance of Angelita's who on occasion

helped her write letters in English to the VA and who attested at trial to Angelita's honesty. Mr. Blake, who also helped Angelita during her visits to the United States and to the VA, also testified as to her honesty and reliability. Agent Penton testified that Angelita's benefits had been restored once she was cleared of this investigation. He further testified that Bonner behaved deceitfully upon their first encounter and refused to answer questions regarding certain exculpatory documents he had produced. Mr. Farrell Tate, a common acquaintance of Bonner and the Kettleses, expressed doubts as to Bonner's reputation for honesty and truthfulness and claimed that Bonner was not a generous person. Clariva Miranda, an acquaintance of Bonner who would have testified that he had gone to Bonner's house to translate a telephone conversation into Portuguese, was not allowed to testify.

## II

On this appeal, Bonner takes issue with several evidentiary rulings of the district court, and asks for a new trial. When a defendant has objected at trial to the admission or exclusion of evidence, we review the district court's ruling only for abuse of discretion. *United States v. Montani*, 204 F.3d 761, 765 (7th Cir. 2000) (admission of evidence); *United States v. Lane*, 267 F.3d 715, 719 (7th Cir. 2001) (exclusion of evidence). When no such objection has been made, the point is forfeited and the defendant may prevail only upon a showing of plain error. *United States v. Curtis*, 280 F.3d 798, 801 (7th Cir. 2002). Even if plain error occurred, the defendant is entitled to a new trial only if she "probably would not have been convicted but for the erroneously admitted evidence." *United States v. Kellum*, 42 F.3d 1087, 1092 (7th Cir. 1994) (quotations omitted).

A.  Introduction of Evidence about Angelita's Character

Angelita was the government's principal witness. The prosecution sought to introduce several statements that were aimed at bolstering her trustworthiness, including the statements from Claudia Grahamm and Dean Blake, and a statement from Agent Penton that Angelita's benefits had been restored in 1999.

"Witness bolstering," or "offering evidence solely for the purpose of enhancing a witness's credibility before that credibility is attacked," *United States v. Scott*, 267 F.3d 729, 734 (7th Cir. 2001) (quotations omitted), is impermissible, at least in the first instance. Once the credibility of the witness has been challenged, however, such evidence may be offered to rehabilitate a witness in the eyes of the jury. See *id.*; see also FED. R. EVID. 608(a)(2) ("evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked"). The district court found that Angelita's character had been challenged and thus that rehabilitation evidence was proper.

Bonner disagrees. Because he did not object on this specific ground to the witnesses we are considering, we review this part of the case only for plain error. In fact, it would not matter if we were reviewing for abuse of discretion, because we find ample evidence in the record to support the district court's view. In his opening statement, after setting out his version of the events, Bonner's counsel stated: "Now, I don't expect Ms. Kettles to agree to that, because now she is receiving government benefits again, and she had been cut off in the past." He also suggested that Angelita would not confirm Bonner's story because she had recently been cleared of the investigation. On cross-examination, Angelita was questioned by the defense about her receipt of money from the VA in connection with the fact that she "would have to tes-

tify against Mr. Bonner." These were all statements that implied that Angelita might have gained some advantage from cooperating with the government's case, and as such, they are precisely the kind that allow for testimony aimed at rehabilitation of the witness's character. See, *e.g.*, *United States v. Lindemann*, 85 F.3d 1232, 1242 (7th Cir. 1996). Given these attacks on her credibility, the district court did not err in admitting the evidence Bonner has challenged.

One supposedly improper statement came from Grahamm, who testified positively about "what kind of woman Mrs. Kettles is." Dean Blake also testified that Angelita was "an honest mother, she was a good wife, and she is a friend of mine" in response to a question about Angelita's reputation for truthfulness and honesty. Defense counsel objected, but on the issue of foundation, not on the propriety of bolstering. The district court directed that the question be made more precise, and defense counsel did not object to the reformulated question that elicited the challenged response.

Bonner also challenges Agent Penton's testimony that Angelita's benefits were restored prior to trial after she was exonerated, claiming that this was a bolstering statement given that Penton was sitting at the prosecution's table. It is true that the behavior of a witness, like an investigator who sits at the prosecution's table, can be scrutinized in light of the inference the jury may draw from the close nexus between the witness and the prosecutor. See, *e.g.*, *United States v. Davis*, 532 F.2d 22, 28 (7th Cir. 1976) (it was improper for prosecution witness seated at prosecutor's table to rear back and laugh during cross-examination of defendant). But here, we can detect no impropriety in the admission of the agent's testimony. The fact standing alone that Agent Penton sat at the prosecution's table is not a reason to exclude this statement, especially in the absence of a specific objection.

B.  Introduction of Bonner's Character Evidence

Bonner also objects to the introduction by the prosecution of negative "character evidence" about himself. General evidence of the defendant's character is inadmissible in criminal cases. See *United States v. Romero*, 189 F.3d 576, 587 (7th Cir. 1999); FED. R. EVID. 404(a). Such evidence becomes admissible, however, where the defendant has introduced evidence aimed at portraying his own character in a positive light, and the prosecution is merely trying to counter the inferences to be drawn from such statements. See FED. R. EVID. 404(a)(1). The prosecution may, for instance, introduce evidence of a defendant's bad reputation after a defendant has put her reputation at issue. See, *e.g.*, *United States v. Marrero*, 486 F.2d 622, 626 (7th Cir. 1973).

Here, the defense chose to introduce evidence of Bonner's honesty and generosity. Bonner's counsel harped on the bonds of trust between Bonner and Angelita as well as Bonner's generosity, pointing out that Bonner did things for Angelita that no one else bothered to do. Counsel's opening statement also lauded Bonner's character, thus "opening the door" to the prosecution's evidence. *United States v. Jordan*, 722 F.2d 353, 358 (7th Cir. 1983); see also *United States v. Pacione*, 950 F.2d 1348, 1353 (7th Cir. 1992).

To respond to Bonner's benevolent picture of himself, the prosecution elicited the testimony of Mr. Tate, a government lawyer who had known Bonner for over a decade. Tate testified that despite their long acquaintance, he did not know anything about Bonner's reputation for truthfulness and honesty. To the question "Do you know if the Defendant is a generous person?" Tate replied "No." We do not dispute that Tate's testimony was quite damning, but it was fair game under the circumstances. Once again, although the lack of a timely and specific objection leaves us with only plain error review, the standard makes little difference. Under any standard, we are satis-

fied that defense counsel sufficiently brought into issue Bonner's good character to allow the government to counter by presenting Tate's testimony.

Bonner similarly challenges the following colloquy with Agent Penton, which occurred in the course of discussing the handwriting samples:

Q. That's the first one he did. At the time he started providing these exemplars, how is he seated?

A. He was seated directly across from me.

Q. What did you observe him to be doing as he's writing these exemplars?

A. As he was providing the handwriting exemplars, I don't know if I should use the word or not—Mr. Bonner appeared to be acting very deceptive in providing these—.

DEFENSE COUNSEL:   Objection, your Honor.

THE COURT:   I'm sorry.

DEFENSE COUNSEL:   Not responsive to the question.

THE COURT:   Repeat the question again.

Q. Agent Penton, what did you observe Mr. Bonner to be doing as he was providing the handwriting exemplars?

. . .

THE COURT:   The last answer before is ordered stricken. The jury will disregard the last answer [. . .] I'm sorry, Mr. Schlesinger [Defense Counsel], there was an objection. Does that satisfy you, Mr. Schlesinger?

DEFENSE COUNSEL:   Yes.

As the district court sustained the objection and asked the jury to disregard the comment, Bonner has little to complain about. Absent truly unusual circumstances, errors that are the subject of curative instructions are deemed harmless. See *Greer v. Miller*, 483 U.S. 756, 767 (1987); *United States v. Robbins*, 197 F.3d 829, 836 (7th Cir. 1999). There is a very strong presumption that a jury has understood and followed the trial court's limiting instruction, erasing the improper influence that might have been caused by the stricken statement. See *United States v. Moore*, 115 F.3d 1348, 1358 (7th Cir. 1997). We have no reason to believe that the jury disregarded the corrective instruction or that it was inadequate to address the problem.

### C. Evidence that Bonner Declined To Speak to an Agent

Bonner also argues that the admission of testimony about his silence during the handwriting exemplar procedure at Hines violated his Fifth Amendment right against compulsory self-incrimination. The prosecution attempted to introduce evidence of Bonner's pre-arrest silence through the following exchanges:

Q. And at the time you served that subpoena, did you speak with him at all?

A. No, I asked him—I handed him the subpoena and told him that he was a subject of a criminal investigation and asked if he understood what he read in the subpoena and he said yes. I asked him if he was willing to talk to me at that time, and he stated no.

Penton went on to describe the meeting during which Bonner provided the handwriting exemplars:

Q. By the way, does he talk to you at all, does he want to discuss the investigation with you when he comes in to give you the handwriting exemplars?

A.  No, Ma'am. At that time, I asked him if he was
    willing to talk—specifically I asked him about these
    documents also. I asked him if he was willing to be
    interviewed at that time.

DEFENSE COUNSEL:  Objection. May we approach?

After a side bar, Penton's testimony continued as follows:

Q.  Agent Penton, can you resume your answer?

A.  Yes, Ma'am. I asked Mr. Bonner if he was willing to
    talk to me. Specifically, I wanted to talk to him
    about the exhibit here, Exhibit 47, and ask him if
    he was willing to speak to me about the investiga-
    tion and possible involvement in the fraud scheme.
    At that time he evoked [sic] his right to an attorney.

Bonner argues that such explicit testimony about his
silence was inadmissible under *Grunewald v. United States*,
353 U.S. 391 (1957). *Grunewald* held that it was improper
to admit testimony about a defendant's refusal to speak
to a grand jury pursuant to a subpoena. *Id.* at 424. Where
a prosecutor on her own initiative asks the jury to draw
an adverse inference from a defendant's silence, *Griffin
v. California*, 380 U.S. 609, 613 (1965) holds that the
Fifth Amendment privilege against self-incrimination is
violated. A defendant's right to silence, coupled with her
right not to have any reference to her silence made at trial,
exists even before the defendant receives *Miranda* warn-
ings. *United States ex rel. Savory v. Lane*, 832 F.2d 1011,
1017-18 (7th Cir. 1987). The government suggests that
we need not consider Bonner's argument for the simple
reason that he was not yet "in custody" during his en-
counter with Agent Penton; we prefer, however, not to
resolve that point, since it is clear in any event that
there was nothing wrong with the reference to Bonner's
selective silence.

As the government does not dispute the applicability of *Savory v. Lane* to Bonner, we will assume that his silence is equivalent to the silence of a defendant who is first approached by a prosecutorial body. We also assume for the sake of argument that Bonner is asserting that the *reference* to his silence was, on these facts, an implicit invitation to the jury to draw a negative inference from that silence. (Note that it is only the latter that *Griffin* addresses. If Bonner is not saying that, then *Griffin* cannot help him anyway.) But all these assumptions favorable to Bonner do not lead to the conclusion that his rights were violated. The government argues, and we agree, that Bonner's words and conduct fell within the rule of *United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir. 1991), which holds that if a defendant starts down an exculpatory path by providing statements, and then clams up and refuses to expand on those statements, the latter silence may be introduced at trial. *Davenport* rests on two propositions. On the one hand, it would be unseemly or dishonest if a prosecutor could purport to respect the silence of an accused at one stage and then use that same silence at a later stage of the same prosecution to create an inference of guilt. Conversely, it would not serve the criminal justice system to allow defendants to use the Fifth Amendment both as a shield and as a sword, answering questions selectively and preventing the prosecution from mentioning such selectiveness at trial. See also *McGahee v. Massey*, 667 F.2d 1357, 1364 (11th Cir. 1982) ("[T]he law does not provide a sword by which the defendant may selectively testify as to the merits of his prosecution, yet shield himself from comment on his failure to explain incriminating evidence properly admitted prior to his testimony.").

We have a *Davenport* situation here because Bonner voluntarily provided documents to Agent Penton aimed at dispelling any incriminating evidence the government

had. Once he did that, the government was entitled to mention at trial that Bonner refused to talk about those same documents when he became concerned that he might incriminate himself. We acknowledge that Bonner's case is a bit different from the *Davenport* pattern, insofar as Bonner merely presented his documents (without oral commentary) and then refused to answer questions. But this is a distinction without a difference. The defendant in *Davenport* tried to tell an exculpatory story, and when pressed for details, invoked the Fifth Amendment. Bonner's proffer of documents beyond the scope of the subpoena was exactly the same kind of attempt to exculpate as the defendant's initial oral statements in *Davenport*. Unlike the handwriting samples that Bonner was compelled under subpoena to supply (and thus which were not testimonial under *Schmerber v. California*, 384 U.S. 757, 765 (1966)), his offer of the power of attorney and the letter he wrote to the VA on Angelita's behalf were not compelled. Instead, his act of producing them was designed to support his story, and that act was the equivalent of testimony. *Davenport* controls here, and thus Bonner's rights were not violated when Agent Penton testified about his unwillingness to discuss those particular documents.

### D.  Exclusion of Proposed Testimony of a Defense Witness

The last arrow in Bonner's quiver is the trial court's decision to exclude the testimony of Clariva Miranda. According to defense counsel's offer of proof, Miranda, an acquaintance of Bonner who spoke Portuguese, would have testified that he had had two phone conversations in Portuguese with a person who identified herself as Angelita Kettles.

The prosecution objected to Miranda's proposed testimony, contending that it was not tied to an identifiable

time period and was being offered solely in an attempt to impeach a government witness. Defense counsel basically conceded the point about the purpose of Miranda's contribution, noting that it would impeach Angelita's testimony that she had not spoken to Miranda on the telephone. Counsel repeated several times that Miranda's testimony was "only offered for the limited purpose of impeachment." Based on this, the trial court sustained the objection, after having given defense counsel ample opportunity to argue why the testimony was proper.

The district court correctly recognized that Miranda's proposed evidence ran afoul of FED. R. EVID. 608(b), which provides that extrinsic evidence of a witness's conduct cannot be introduced solely for the purpose of impeachment. While impeachment testimony is allowed, and indeed is indispensable for the adversary criminal system, "one may not contradict for the sake of contradiction; the evidence must have . . . an independent ground for admission." *United States v. Kozinski*, 16 F.3d 795, 806 (7th Cir. 1994). Bonner has shown no such independent ground, "the impeaching fact could not have been introduced into evidence for any purpose other than contradiction." *Id.* Miranda's testimony was thus collateral and properly excluded. See *Taylor v. National R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir. 1990). See also *United States v. Goot*, 894 F.2d 231, 239 (7th Cir. 1990); *United States v. Rovetuso*, 768 F.2d 809, 817 (7th Cir. 1985).

Bonner now argues that independent grounds for admission existed because Miranda's statement would have shown that Bonner took steps to communicate with Angelita to help her resolve the VA troubles and would make it likely that Angelita knew of and approved the transaction. It is hard to see how all this could be shown through evidence that a third party spoke on the telephone with a woman who identified herself as Angelita. In any event, he made no such argument to the district

court, and we are satisfied that the district court did not abuse its discretion in its ruling.

## V

For these reasons, we AFFIRM Bonner's conviction.

A true Copy:

      Teste:

              _____

              *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*